1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   Dale Sundby, Trustee,                    Case No.:  19-CV-00390-GPC-MDD

12                            Plaintiff,      **ORDER**

13   v.
                                              **(1) DENYING MARQUEE FUNDING
14   Marquee Funding Group, Inc.; Salomon     GROUP'S MOTION TO DISMISS**
     Benzimra, Trustee; Stanley Kesselman,    **[ECF No. 30];**
15   Trustee; Jeffrey Myers; Kathleen Myers;
     Andres Salsido, Trustee; Benning         **(2) DENYING LENDER
16   Management Group 401(k) Profit Sharing   DEFENDANTS' MOTION TO
     Plan; Christopher Myers; Vickie McCarty; DISMISS [ECF No. 31];**
17   Dolores Thompson; Kimberly Gill
     Rabinoff; Steven M. Cobin, Trustee;
18   Susan L. Cobin, Trustee; Equity Trust
     Company, Custodian FBO Steven M.
19   Cobin Traditional IRA; Todd B. Cobin,
     Trustee; Barbara A. Cobin, Trustee;
20   Fasack Investments LLC; and Does 1-X,
21
                            Defendants.
22

23

24

25        The matter before the Court arises from two loans that pro se Plaintiff, Dale

26   Sundby, obtained from the above-captioned Defendants, secured by a mortgage on his

27   primary residence.  Plaintiff has sued the Defendants for damages pursuant to the Truth

28

                                      1

in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and for a declaration clarifying the parties' rights and obligations with respect to one of the loans.

On May 22, 2019, Defendant Marquee Funding Group, Inc. ("Marquee"), filed a motion to dismiss Plaintiff's First Amended Complaint (hereinafter "FAC").  (ECF No. 30.)  This motion has been opposed and replied to (ECF Nos. 34, 36); upon request by the Plaintiff, the Court permitted a sur-reply.  (ECF No. 39.)  On May 28, 2019, the remaining defendants (hereinafter the "Lender Defendants") filed a motion to dismiss.  (ECF No. 31.)  This motion has also been fully briefed.  (ECF Nos. 34, 35.)

Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument.  For the reasons explained below, the Court denies both motions.

## I.    Background

### A. Factual Allegations

#### 1.  The 2016 Loan

In 2016, Plaintiff, acting on behalf of his family trust, arranged with Marquee, a mortgage broker, to obtain refinancing on an existing 2015 mortgage loan secured by Plaintiff's primary residence at 7740 Eads Avenue, La Jolla, CA 92037 (the "Eads property").  (FAC ¶¶ 27–30, ECF No. 13.)

On March 10, 2016, Plaintiff submitted to Marquee a "Uniform Residential Loan Application for a conventional fixed-rate mortgage.  (*Id.*)  Plaintiff's application sought a residential mortgage loan of $2,600,000, secured by his primary residence, and indicated that the purpose of the loan was for refinancing.  (FAC ¶¶ 27–31.).  Plaintiff stated only the Eads property under "Assets" and listed two loans secured by the Eads property as "Liabilities."  (FAC ¶¶ 32–35.)    Plaintiff's application did not make any statement as to the borrower's "employer," nor did it state any "income."  (FAC ¶¶ 32-33.)

Pursuant to this application, on March 30, 2016, Plaintiff signed a Note Secured by a Deed of Trust ("2016 Note"), which included a prepayment paragraph.[1] The 2016 Note contains a "payments" paragraph prescribing a combined balloon payment and one month of interest. It indicates that the borrower's "payments are Interest Only." (FAC ¶¶ 48–49.) That same day, Plaintiff signed an Amendment to the 2016 Note which stated that "[i]t is hereby agreed that borrower is prepaying 11 months of interest through the loan transaction." (FAC ¶ 50.)

The 2016 Loan was funded on April 6, 2016. The corresponding Deed of Trust was recorded on April 7, 2016. (FAC ¶ 52.) The Escrow Holder's Final Settlement Statement for this transaction indicated that Marquee was due a $39,000.00 broker's fee, designated as an "Origination Charge." (FAC ¶¶ 53–54.) According to Plaintiff, "Defendants did nothing to qualify Plaintiff for the 2016 Loan," even though his 2016 application listed no employer, no income, or non-Property asserts. (FAC ¶ 131(e).)

### 2. 2017 Loan

In 2017, Plaintiff arranged with Marquee to obtain a $3,160,000 refinancing for his residential mortgage loan. Plaintiff completed a "Uniform Residential Loan Application" indicating, once again, the refinance purpose and the residential property at issue. (FAC ¶ 55; *see also* ECF No. 33-1, at 7 (2017 application).) The 2017 application stated no employer. According to Plaintiff, the amount listed as the borrower's income, minus expenses, was less than 10% of the $25,016.67 monthly interest on the loan. (FAC ¶¶ 58–59.) The non-property assets on the 2017 application were less than the non-property liabilities. (FAC ¶ 60.) The 2017 application was submitted to Marquee on May 17, 2017. According to Plaintiff, despite these red flags, Defendants never qualified him for the 2017 Loan.

---

[1] "In lieu of a Prepayment Penalty Borrower agrees to pay the Lender a Minimum of 90 days Interest from the day of this loans funding. (4/6/2016)." (FAC ¶ 47.)

3

On June 27, 2017, Marquee emailed a bundle of loan documents to Plaintiff. These documents included a deed of trust, a note secured by a deed of trust (the "Original 2017 Note"), a notice of right to cancel, a disclosure statement, a set of escrow instructions, and a set of closing disclosures. (FAC ¶¶ 63–80.) The closing disclosures indicated the loan's purpose as "refinance." (*Id*.) On June 28, 2017, Plaintiff signed all the June 27, 2017 documents and initialed every page of each document not requiring a signature. (FAC ¶ 82.)

On June 29, 2017, Marquee emailed Plaintiff a set of updated documents, and requested Plaintiff to "review, print and sign" the updated documents, "confirming acceptance of the vesting change." (FAC ¶ 86.) These documents included (1) an updated Note Secured by Deed of Trust ("Emailed 2017 Note," ECF No. 33-1, at 28); and a "Page 1" of an updated Deed of Trust ("Emailed 2017 Deed of Trust Page 1," ECF No. 33-1, at 26). (FAC ¶¶ 87–88.)

Under the Emailed 2017 Note, Plaintiff promised to make payments of the principal, plus interest, to the "Lenders" named in Paragraph 1. Paragraph 5 contains a "Prepayment Penalty," which advises, "[i]f this loan is paid off or refinanced during the first Six (6) month(s) of the term, a prepayment penalty equal to the difference between Six (6) month(s) of interest and the date of prepayment shall be due tendered." Paragraph 9, titled "Use of Proceeds," states that "Loan Proceeds are intended to be used primarily for business and commercial purposes and are not intended to be used for personal, family or household purpose or in any manner which may result in the loan Transaction not being exempt from Truth in Lending Act (TILA), 15 U.S.C.A. 1602(h)."

On June 29, 2019 Plaintiff initialed the bottom of the Emailed Deed of Trust Page 1, signed the Emailed 2017 Note, and sent back all of the updated documents to Marquee via FedEx. (FAC ¶¶ 93–99.) Plaintiff also sent PDF versions of the updated loan documents to Marquee. (FAC ¶ 100.)

### 3. Forbearance Letter and Subsequent Developments

On January 24, 2019, Marquee's attorney emailed Plaintiff to advise him that Marquee was in the process of finalizing a draft forbearance agreement. (FAC ¶ 101.) On January 29, 2019, Plaintiff received the draft agreement, which stated: "Lender and Marquee contend that the Loan Documents are enforceable, and that Lender can pursue foreclosure; Borrower disputes such contentions." (FAC ¶ 106.)

After receipt, Plaintiff noticed that the draft forbearance agreement named different entities as Lenders than was stated on the Emailed 2017 Deed and the Emailed 2017 Note. On February 8, 2019, Plaintiff and obtained a certified copy of the deed for the 2017 Loan from the San Diego County Recorder (hereinafter the "Recorded 2017 Deed"). (FAC ¶¶ 107–108.) That deed was recorded on July 7, 2017 by Marquee, and according to Plaintiff, was not the same as the Emailed 2017 Deed which he had signed and returned to Marquee. (FAC ¶¶ 109.)

Plaintiff observes two primary differences between the two deeds. First, Plaintiff's signature, which he had affixed to the Emailed 2017 Deed of Trust Page 1, was missing from the Recorded 2017 Deed.

Second, the Emailed 2017 Deed was made with reference to the entirety of the Eads property, which, according to attachment Exhibit A, encompassed Parcels 1A, 1B, 2A, 2B, 3A, and 3B; the Recorded 2017 Deed, on the other hand, narrowed the property conveyed to only "Parcels 1A, 1B and 2B." (*Compare* ECF No. 33-1, at 26 (Emailed), with ECF No. 31-3, at 50 (Recorded).)

Third, the lenders named in the first paragraph of the deeds were not identical, and further, their stated ownership interest percentages are not the same. For example, whereas in the Emailed 2017 Deed, "Jeffrey Myers and Kathleen Myers, husband and wife as joint tenants," were to obtain "an undivided 44.147% interest," in the Recorded 2017 Deed, the same were to take "an undivided 44.148% interest." (*Compare* ECF No. 33-1, at 26 (Emailed), with ECF No. 31-3, at 50 (Recorded).) Similarly, whereas in the Emailed 2017 Deed, "Equity Trust Company Custodian FBO Steven M. Cobin Traditional IRA" was to take "an undivided 15.823% interest," the Recorded 2017 Deed

seems to have bifurcated that interest, providing instead that "Steven M Cobin and Susan L. Cobin, Trustees of the Cobin Family Trust," would take "an undivided 7.911 interest," and that the "Equity Trust Company Custodian FBO Steven M. Cobin Traditional IRA," would take the other undivided 7.911 interest. (*Id.*)

Observing these inconsistencies, Plaintiff asked Marquee to send him copies of the loan documents which Plaintiff signed and returned on June 29, 2017—i.e., the emailed documents. (*See* FAC ¶¶ 115–117 (asking Marquee to provide "the final 2017 loan documents").) On February 13, 2019, Marquee used a service called "Dropbox" to send to Plaintiff documents responsive to his request.

According to Plaintiff, the deed Marquee sent via Dropbox was the Recorded 2017 Deed, not the Emailed 2017 Deed that he recalls signing. Plaintiff also alleges that the escrow instructions received through Dropbox were not the ones he had signed, since the Dropbox version was missing his signature. (FAC ¶ 127.) He further claims that the note received through Dropbox ("Dropbox 2017 Note") was not the same as the Emailed 2017 Note which he approved and signed. (FAC ¶¶ 118–119.)

During the course of briefing on the pending motions, the defending parties produced two versions of the 2017 note. Marquee's copy is introduced as an attachment to the Declaration of Scot Fine (hereinafter the "Fine 2017 Note"). (ECF No. 30-1, at 37 (Decl. of Scot Fine, dated May 3, 2019).) Mr. Fine is the Chief Executive Officer of Platinum Loan Servicing, Inc., the mortgage loan servicer to the 2016 and 2017 Loans. (*Id.* at 8.) He avers that he has produced the note "as maintained within PLS's loan files." (*Id.*) The Lender defendants introduced their copy of the 2017 note as an attachment to the Declaration of Troy H. Slome (hereinafter the "Slome 2017 Note"). (ECF No. 31-3, 61 (Decl. of Troy H. Slome, dated May 28, 2019).)

Notably, neither of the Defendants' note documents are identical to the Emailed 2017 Note, and both are different from each other.

Plaintiff avers that before the official records search and receipt of the Dropbox loan documents, Plaintiff had not known that the Emailed 2017 Note had been altered,

and that the Emailed 2017 Deed had not been recorded.  On February 25, 2019, Plaintiff "rescinded" the Emailed 2017 Note and the Emailed 2017 Deed because "they never came into existence."  (FAC ¶ 128.)

## B. Procedural History and Present Claims

Plaintiff filed his original complaint on February 26, 2019 (ECF No. 1), and submitted the operative complaint, i.e., the FAC, on May 8, 2019.  (ECF No. 13.)  The FAC alleges two causes of action against Marquee, several trustees, and a number of "Lender defendants."[2]

Plaintiff's first cause of action articulates several TILA violations with respect to his 2016 and 2017 Loans.  As a definitional matter, Plaintiff contends that both loans are "high cost mortgages" because they were secured by his principal dwelling and included "prepayment fees" exceeding "in the aggregate, more than 2 percent of the amount prepaid."  15 U.S.C. § 1602(bb)(1)(A)(iii); § 1639(c)(1)(B).

Plaintiff's substantive TILA allegations are three-fold.  First, Plaintiff alleges that the prepayment fees violated 15 U.S.C. § 1639(c)(1)(A), which forbids high cost mortgages from including "prepayment penalties for paying all or part of the principal before the date on which the principal is due."  15 U.S.C. § 1639(c)(1)(A).  Second, Plaintiff alleges a violation of § 1639c(a), which imposes upon creditors the duty to make a reasonable and good faith determination of the consumer's ability to repay before making a loan.  Third, Plaintiff asserts that Marquee, as the loan originator, violated § 1639b(c)(3)(A)(i) by steering Plaintiff to a residential mortgage loan which he lacked a reasonable ability to repay.  For these TILA violations, Plaintiff seeks damages in accordance with §§ 1639b and 1640.

Plaintiff's second cause of action is styled as a declaratory judgment claim, but in effect is also a request for rescission.  Plaintiff seeks a declaration that the Recorded 2017

---

[2]    The Lender defendants appear to encompass several entities which were named as Lender in the 2016 and 2017 deeds of trust.

Deed and the Dropbox 2017 Note are void and with no effect. He also seeks a Court order to reconvey the Eads property back to the family trust.

Marquee filed a motion to dismiss the TILA claims against it. (ECF No. 30.) The Lender defendants filed a motion to dismiss both the TILA and declaratory judgment claims. (ECF No. 31.) The Court will address sufficiency of the TILA claims first, and then turn to the declaratory judgment claim.

## II.    Rule 12(b)(6) Standard

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In this respect, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

"Generally, a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion." *Intri-Plex Techs., Inc. v. Crest Grp.*, Inc., 499 F.3d 1048, 1052 (9th Cir. 2007). A court normally must convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings . . . A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—

without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).

All the documents referred to in this case are cognizable by the Court upon a Rule 12(b)(6) challenge. The documents attached to Plaintiff's opposition brief were incorporated by reference in his FAC. The Court may thus consider them. *See, e.g., Mulinix v. Unifund CCR Partners*, No. 07-1629DMS, 2008 WL 2001747 (S.D. Cal. May 5, 2008) ("A complaint is deemed to include materials incorporated by reference and documents that, although not incorporated by reference, are 'integral' to the complaint."). Defendants' materials are also appropriately subject to notice. For one, their proffered deeds and notes are incorporated by reference in Plaintiff's FAC, and are integral to Plaintiff's claim that they have been improperly altered. Furthermore, they are independently judicially noticeable. *See, e.g., Fimbres v. Chapel Mort. Corp.*, No. 09-CV-0886-IEG (POR), 2009 WL 4163332, at *3 (S.D. Cal. Nov. 20, 2009) (taking judicial notice of deed of trust).

## III. Statutory Context and Plaintiff's Claims

### A. Dodd-Frank amendments to TILA

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111–203, 24 Stat. 1376 (2010), to amend several sections of the Truth in Lending Act, 15 U.S.C. § 1601.[3] Dodd-Frank was passed "in response to a 'financial crisis that nearly crippled the U.S. economy,'" which Congress attributed "the simple failure of federal regulators to stop abusive lending, particularly unsustainable home mortgage lending.'" *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1189 (9th Cir. 2018) (quoting S. Rep. No. 111-176, at 2, 15 (2010)). "Dodd-Frank brought about a 'sea change' in the law, affecting nearly every corner of the

---

[3]    *See, e.g., Arizmendi v. Wells Fargo Bank, N.A.*, No. 117CV01485LJOSKO, 2018 WL 3219383, at *4 (E.D. Cal. June 29, 2018).

nation's financial markets.'" *Id.* (quoting *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 718 (D.C. Cir. 2016)).

As a result, residential mortgage lending practices were placed under increased scrutiny pursuant to Title XIV of Dodd-Frank. These new requirements, now found in relevant part, at 15 U.S.C. §§1639, 1639b and 1939c, provide "for the imposition of additional standards in the mortgage lending industry." *Megino v. Linear Fin.*, No. 2:09-CV-00370-KJD, 2011 WL 53086, at *8 n.1 (D. Nev. Jan. 6, 2011). Consistent with the teleological thrust of Dodd-Frank, these sections were instituted with the explicit Congressional purpose "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2) (referencing §§ 1639b, 1639c).

**B. Plaintiff's Ability-to-Repay Claims**

Section 1639c(a)(1) states the general duty invoked by Plaintiff with respect to his ability-to-repay claims:

> In accordance with regulations prescribed by the Bureau [i.e., the Consumer Finance Protection Bureau (CFPB)], no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance . . . , and assessments.

15 U.S.C. § 1639c(a)(1). Subparagraph (a)(3) further provides that the determination "shall include consideration" of the following factors:

> [T]he consumer's credit history, current income, expected income the consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan.

15 U.S.C. § 1639c(a)(3).

19-CV-00390-GPC-MDD

Plaintiff asserts that Marquee, as a loan originator pursuant to 15 U.S.C. § 1602(g), and the Lender defendants, as creditors pursuant to 15 U.S.C. § 1602(dd)(2), violated § 1639c(a)(1) because they did nothing to qualify him for his 2016 and 2017 loans to ensure that he had an ability to repay. He also pleads that Marquee violated § 1639b(c)(3)(A)(i) when it steered him toward residential mortgage loans which he lacked a reasonable ability to repay. *See* 15 U.S.C. § 1639b(c)(3)(A)(i) ("The Bureau shall prescribe regulations to prohibit . . . mortgage originators from steering any consumer to a residential mortgage loan that . . . the consumer lacks a reasonable ability to repay . . . .").

### C. Plaintiff's Prepayment Penalty Claims

Under Dodd-Frank, TILA prohibits a "high-cost mortgage" from "contain[ing] terms which a consumer must pay a prepayment penalty for paying all or part of the principal before the date on which the principal is due." 15 U.S.C. § 1639(c)(1)(A); *see also* 12 C.F.R. 1026.34 (CFPB regulations). A "high-cost mortgage" is defined under 15 U.S.C. § 1602(bb)(1)(A) as "a consumer credit transaction that is secured by the consumer's principal dwelling."

Plaintiff contends that both his 2016 and 2017 Loans were high-cost mortgages because in each instance, "the credit transaction documents permit[ted] the creditor to charge or collect prepayment fees or penalties more than 36 months after the transaction closing or such fees or penalties exceed, in the aggregate, more than 2 percent of the amount prepaid." 15 U.S.C. § 1602(bb)(1)(A)(iii). He further avers that each loan contained prepayment penalties as defined by § 1639(c)(1)(B) ("Construction: . . . any method of computing a refund of unearned scheduled interest is a prepayment penalty if it is less favorable to the consumer than the actuarial method . . . .").[4] Thus, Plaintiff

---

[4]    Plaintiff alleges that the 2016 Note included a prepayment provision in which he "agree[d] to pay a prepenalty computed as follows: In lieu of a Prepayment Penalty Borrower agrees to pay the Lender a Minimum of 90 days Interest from the day of this loans funding." (FAC ¶ 47.)  The 2017 Emailed Note included a "prepayments penalties" provision which stated that "If this loan is paid off or

11

argues that defendants are liable for issuing him a high-cost mortgage with a prepayment penalty in contravention of 15 U.S.C. § 1639(c)(1)(A).

## IV.    Cause of Action 1: TILA Claims

Both Marquee and the Lender defendants have submitted motions to dismiss Plaintiff's claims under TILA. While Defendants raise a plethora of arguments, there are certain items which have not been disputed. Marquee does not dispute that it is a "loan originator" as defined by TILA; similarly, the Lender defendants do not deny that they are "creditors." Further, Defendants do not quarrel with Plaintiff's assessment that the 2016 and 2017 Loans contained prepayment penalties, nor have they challenged Plaintiff's characterization of the same as "high-cost mortgages."

### A. Overview of Arguments for Dismissal

Marquee presents three primary defenses in its motion to dismiss. (ECF No. 30.) First, it contends that TILA's wrongful mortgage lender steering provision, 15 U.S.C. § 1639b(c)(3)(A)(i), cannot support a cause of action because the CFPB never issued regulations implementing the statute. Second, even assuming the viability of any such cause of action, Marquee asserts that the 2017 Loan was a commercial business loan, which is not subject to the anti-steering rule for residential mortgages. Third, Marquee argues that Plaintiff failed to plead that his loans did not fall within the temporary or bridge loan exception, 15 U.S.C. § 1639c(a)(8) (providing an exception for "temporary or bridge loan[s] with a term of 12 months or less").

The Lender defendants raise a number of points, two of which merit discussion here.[5] (ECF No. 31.) The Lender defendants' first contention is that Plaintiff's TILA claims are time-barred and not subject to equitable tolling. Like Marquee, the Lender

---

refinanced during the first Six (6) month(s) of the term, a prepayment penalty equal to the difference between Six (6) month(s) of interest and the date of prepayment shall be due tendered." (FAC ¶ 96.)

[5]     Three of the Lender defendants' arguments are so sparsely briefed that they may be considered waived. Out of an abundance of caution, however, the Court will address the balance of those arguments later in the order.

defendants also argue that Plaintiff's loans were exempt from the ability to repay rule because both the 2016 and 2017 loans were temporary or bridge loans.

The Court will address the Defendants' arguments below.

### A. Statute of Limitations

The Lender defendants argue that all of Plaintiff's TILA allegations are time-barred under 15 U.S.C. § 1640(e). Under their reading of of the statute, § 1640(e) established a one-year limitations period for any action for damages under TILA, commencing from the time the loan documents were signed. (ECF No. 31-2, at 10–11, citing *Carillo v. Countrywide Home Loans*, No. 09CV2676 DMS (WVG), 2010 WL 1904883, *2 (S.D. Cal. 2010).) The Lender defendants contend that because the loan documents at issue were signed in 2016 and 2017, and the action was not filed until February of 2019, Plaintiff's suit must be barred for untimeliness.

Plaintiff objects that the Lender defendants have selectively quoted from § 1640(e) and relied on outdated caselaw to arrive at the one-year limitations period. Plaintiff insists that he is timely under an exception to the one-year limitations period established by Dodd-Frank.

Despite the fact that Plaintiff is proceeding without legal counsel, it is Plaintiff who is correct on the law. Section 1640(e) provides as follows:

> Except as provided in the subsequent sentence, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. . . . *Any action under this section with respect to any violation of section 1639, 1639b, or 1639c of this title may be brought in any United States district court, or in any other court of competent jurisdiction, before the end of the 3-year period beginning on the date of the occurrence of the violation.*

15 U.S.C. § 1640(e) (emphasis added).

Because Plaintiff asserts violations of §§ 1639(c), 1639b, and 1639c, his claims fall within the three-year exception stated in the second sentence of the above quoted text. *See Carlos v. Beneficial Fin. I Inc.*, No. 17 C 1341, 2017 WL 5593317, at *4 (N.D. Ill.

Nov. 21, 2017) (discussing how "most of TILA is governed by a one-year statute of limitations," with the exception of the Dodd-Frank amendments, which are subject to a three-year limitations period (quoting *Prescott v. PHH Mortg. Corp.*, No. 16 C 288, 2017 WL 510449, at \*4 (E.D. Va. Feb. 7, 2017)). The Lender defendants, who, over Plaintiff's vehement protestations, made much ado about caselaw construing a now-defunct version of § 1640(e), are advised to refrain from cherry-picking favorable statutes of limitations from outdated authorities.[6]

Plaintiff's 2019 suit, alleging violations with respect to loans issued in 2016 and 2017, are timely pursuant to the three-year limitations period.

### B. Bridge Loan Exception to the Ability to Repay Rule

Both Marquee and the Lender defendants make arguments predicated on 15 U.S.C. § 1639c(a)(8). Subsection (a)(8) states that:

> This subsection shall not apply with respect to any reverse mortgage or temporary or bridge loan with a term of 12 months or less, including to any loan to purchase a new dwelling where the consumer plans to sell a different dwelling within 12 months.

15 U.S.C. § 1639c(a)(8).

### 1. Marquee

Marquee's argument as to this subsection is easily dismissed. Marquee argues that Plaintiff's § 1639b claim (for wrongful mortgage originator steering) is subject to the exception under § 1639c(a)(8) because Plaintiff did not allege that the 2016 and 2017 Loans were *not* temporary or bridge loans. (ECF No. 30-1, at 6.) This argument fails on two grounds. First, the Court is not convinced that the temporary and bridge loan exception applies to claims brought pursuant to § 1639b. Indeed, the statutory text instructs that § 1639c(a)(8) applies to "[t]his subsection," i.e., § 1639c(a). Second, even assuming *arguendo* that the exception applies to a different section of the statute, i.e., §

---

[6]    The Lender defendants' support for a 1 year limitations period, i.e., *Carillo*, 2010 WL 1904883, and *Skrabe v. U.S. Bank, N.A.*, No. C10-03230 HRL, 2012 WL 6019586, \*3 (N.D. Cal. 2012), both involved loan documents which were signed prior to 2010.

1639b, Marquee's argument belies a fundamental misunderstanding of what is required to survive a motion to dismiss. Rule 12(b)(6) does not impose upon plaintiffs an obligation to aver in the negative as to every exception to a statutory cause of action.

## 2. The Lender defendants

The Lender defendants' arguments are slightly more compelling. They argue that judicially-noticeable documents prove that the 2017 Loan[7] was a "temporary or bridge loan with a term of 12 months or less," and that Plaintiff's § 1639c(a) claims are legally untenable as a result. (ECF No. 31-2, at 19.) Specifically, the Lender defendants contend that the 2017 Note provides irrefutable evidence of a 12 month loan term. For this proposition, they direct the Court to their version of the 2017 Note, i.e., the Slome 2017 Note. (ECF No. 31-3, 61.) The Lender defendants do not explain how they derive a 12 month loan term from the Slome 2017 Note, explaining only through Mr. Slome's declaration that their version of the note has "a one year term maturing on July 8, 2018." (ECF No. 31-3, at 2.)

Plaintiff disagrees that the 2017 Loan had a 12 month loan term. Although Plaintiff does not concede its authenticity, Plaintiff urges that the plain terms of the Slome 2017 Note belies the Lender defendants' assertion of a 12 month loan term. According to Plaintiff, the operative dates are June 27, 2017 (the date listed at the top of the Slome 2017 Note) and July 8, 2018 (the date listed as the Payment Due Date), making the loan term greater than 12 months. (ECF No. 34, at 6.)

At this juncture, the Court is not prepared to find that the Lender defendants have demonstrated through judicially-noticeable documents the loan term for the 2017 Loan. First, Lender defendants have not explained what about their note evinces a loan term of 12 months or less, or why Plaintiff's proffered term, running from June 27, 2017 to July 8, 2018, is not the correct loan term. Indeed, they do not address Plaintiff's contentions

---

[7]     The Lender defendants do not argue in their motion to dismiss that the 2016 Loan fell within the temporary or bridge gap exception.

in their reply brief.[8]  To be sure, elements of the Slome 2017 Note are suggestive of a 12 month loan term: Paragraph 2, "Interest," states that interest commences on July 7, 2017, and Paragraph 3, "Payments" states that July 8, 2018 is both the "Payment Start Date[]" and the "Due Date" for the Note.  (ECF No. 31-3, at 61.)  But, without any explanation from Lender defendants as to whether and how the length of a loan term can be discerned from this information, the Court will not grant dismissal under § 1639c(a)(8).

Second, the Court is not prepared to credit any loan term dates calculated on the basis of the Slome 2017 Note.  Plaintiff contends that the instruments produced by the Defendants in this case are inconsistent with, or altered versions of, the loan documents he signed and approved in July of 2017.  Plaintiff has pleaded that the Slome 2017 Note is a void, illegitimate, and altered copy of the Emailed 2017 Note.  Indeed, the two versions of the Notes bear dissimilarities: as Plaintiff notes, there are different entities specified as the "Lender," those entities take interests in different percentages, and, critically, the interest commencement and payment due dates are different.  (*Compare* ECF No. 33-1, at 20 (Plaintiff's Emailed 2017 Note, interest commencing on July 5, 2017, due date July 6, 2018), *with* ECF No. 31-3, at 61 (Slome 2017 Note, interest commencing on July 7, 2017, due date July 8, 2018).)  And, even more disturbingly, the Slome 2017 Note is *also inconsistent* with the version of the note produced by Marquee in support of its motion to dismiss.  (ECF No. 30-1, at 8, 37 (Fine 2017 Note).)

In light of the above, the Court will not dismiss Plaintiff's § 1639c claims.  Neither motion to dismiss convinces the Court that Plaintiff's claims should be barred as a temporary or bridge loan pursuant to § 1639c(a)(8).

## C. Lack of CFPB Regulations Construing § 1639b(c)(3)(A)(i)

---

[8]    To be precise, Lender defendants allude in their introductory paragraphs about a later argument as to the length of the loan term, but never briefed the issue in the body of their reply brief. (ECF No. 35, at 7.)

19-CV-00390-GPC-MDD

The Court next turns to Marquee's defense to Plaintiff's wrongful mortgage originator steering claim pursuant to 15 U.S.C. § 1639b(c)(3)(A)(i). (ECF No. 30-1, at 4–6.) That provision states:

> (3) Regulations
>
> The Bureau shall prescribe regulations to prohibit—
>
> > (A) Mortgage originators from steering any consumer to a residential mortgage loan that—
> >
> > > (i)     The consumer lacks a reasonable ability to repay . . . .

15 U.S.C. § 1639b(c)(3)(A)(i).

Marquee contends that Plaintiff has no cause of action because CFPB, i.e., the "Bureau" charged with implementing the Dodd-Frank amendments to TILA, has not promulgated any regulations to prohibit the conduct prescribed by § 1639b(c)(3)(A)(i).

Plaintiff counters that he has a right to sue under TILA directly, with or without additional implementing regulations. To the extent that CFPB regulations are a necessary predicate to suit, Plaintiff argues in the alternative that CFPB has exceeded its authority by failing to implement § 1639b(c)(3)(A)(i) before the deadline specified by Dodd-Frank.

Because the parties' contentions revolve around the relationship between TILA, Dodd-Frank, and the CFPB, the Court provides a brief overview of the regulatory background.

## 1. Regulatory Background

"Historically, Regulation Z of the Board of Governors of the Federal Reserve System (Board), 12 CFR part 226, has implemented TILA." *Fowler v. U.S. Bank, Nat. Ass'n*, 2 F. Supp. 3d 965, 976 (S.D. Tex. 2014) (quoting Truth in Lending (Regulation Z), 76 Fed. Reg. 79768, 79768 (Dec. 22, 2011)). "[T]he Dodd-Frank Act transferred rule making authority for TILA to the CFPB, effective July 21, 2011." *Id.* at 977 (quotation

marks, citation, and alterations in the original omitted) (citing Designated Transfer Date, 75 Fed. Reg. 57252 (Sept. 20, 2010)).

In 2012, the CFPB proposed rules to implement § 1639b.  After a notice and comment period, the CFPB promulgated its final rules on January 20, 2013.  The final rules codified the regulations at 12 C.F.R. § 1026 *et seq.* and prescribed an effective date of January 10, 2014.  *Id.*  To provide guidance, the CFPB issued "Official Interpretations" alongside its final rules.  *See* Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z) (hereinafter "Official Interpretation"), 78 Fed. Reg. 11280 (Feb. 15, 2013).  Unlike the regulations, the CFPB Official Interpretations were not subject to notice and comment.  *Miller v. Interstate Auto Grp., Inc.*, No. 14-CV-116-SLC, 2015 WL 1806815, at *5 (W.D. Wis. Apr. 21, 2015) (noting that CFPB's commentary was not published to the federal register pursuant to notice and comment).

### 2.  No Regulation Implementing § 1639b(c)(3)(A)(i)

The parties agree that CFPB's final rule construing § 1639b does not include any regulations prohibiting mortgage originators from steering residential mortgagors without regard to their ability to repay.  Indeed, neither of the two most eligible candidates, i.e., 12 C.F.R. § 1026.34 ("Prohibited acts or practices in connection with high-cost mortgages"), nor 12 C.F.R. § 1026.36 ("Prohibited acts or practices and certain requirements for credit secured by a dwelling"), contain any such prohibition.   As further discussed *infra,* the CFPB's decision not to issue regulations implementing § 1639b(c)(3)(A)(i) was deliberate.

### 3.  Whether Plaintiff may sue directly under TILA, as amended by Dodd-Frank, even if the CFPB did not issue final rules

Plaintiff contends that he may sue directly under 15 U.S.C § 1639b(c)(3)(A)(i) notwithstanding the absence of any implementing regulations.  He also argues that Dodd-Frank constrains the CFPB to effectuate the wrongful mortgage origination steering

provisions, and that the CFPB has exceeded its authority by failing to issue regulations by the statutory deadline.

Marquee disagrees, insisting that no cause of action may lie against it until the CFPB issues final rules. For this proposition, Marquee relies exclusively on the CFPB's Official Interpretation, 78 Fed. Reg. 11280.

### a. The CFPB asserts that regulations are a predicate to suit under TILA

In its Official Interpretation, the CFPB explained that it was deliberately omitting from its final rule any regulation which would bear on the conduct described in "new TILA section 129B(c)(3)," which includes 15 U.S.C. § 1639b(c)(3)(A):

> Section 1403 of the Dodd-Frank Act also added new TILA section 129B(c)(3), which requires the Bureau to prescribe regulations to prohibit certain kinds of steering, abusive or unfair lending practices, mischaracterization of credit histories or appraisals, and discouraging consumers from shopping with other mortgage originators. 15 U.S.C. 1639b(c)(3). This final rule does not address those provisions.

Official Interpretation, 78 Fed. Reg. 11292 n.55.

The CFPB further stated its opinion that liability under § 1639b(c)(3) would not trigger until the agency issued additional regulations. In other words, § 1639b(c)(3) was not self-executing:

> Because they are structured as a requirement that the Bureau prescribe regulations establishing the substantive prohibitions, notwithstanding Dodd-Frank Act section 1400(c)(3), 15 U.S.C. 1601 note, the Bureau believes that the substantive prohibitions cannot take effect until the regulations establishing them have been prescribed and taken effect. The Bureau intends to prescribe such regulations in a future rulemaking. *Until such time, no obligations are imposed on mortgage originators or other persons under TILA section 129B(c)(3).*

*Id.* (emphasis added). Thus, if the Official Interpretation is binding, then the apparent absence of any future rulemaking and resulting regulation would doom Plaintiff's claim.

### b. The CFPB's interpretation is subject to *Skidmore* deference

Plaintiff disputes that the CFPB's Official Interpretations should bear on the instant dispute. Plaintiff offers two reasons for rejecting the agency's commentary: first, the Official Interpretation was not issued pursuant to notice and comment, and in any event, it stands in direct defiance of the timeline set by Dodd-Frank for issuing required regulations. The Court agrees with Plaintiff.

As an initial matter, the Court agrees with Plaintiff that it need not grant especial deference to the CFPB's Official Interpretations. Unlike its regulations, the CFPB's Official Interpretations are not made pursuant to notice and comment rulemaking. This renders them ineligible for *Chevron* deference. *See Christensen v. Harris Cty.*, 529 U.S. 576, 586–87 (2000) (agency interpretations which are not arrived at after formal adjudication or notice-and-comment rulemaking "lack the force of law" and do not warrant *Chevron* deference). Instead, the CFPB's interpretations are "entitled to respect" under *Skidmore*, "but only to the extent that those interpretations have the power to persuade." *Id.* at 587 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In accordance with the distinction drawn by the Supreme Court in *Christensen*, courts have consistently recognized that "the CFPB's commentary is not binding authority." *Nash v. PNC Bank, N.A.*, No. CV TDC-16-2910, 2017 WL 1424317, at *4 (D. Md. Apr. 20, 2017); *Barron v. EverBank*, No. 1:16-CV-04595-AT-CCB, 2019 WL 1495305, at *10 (N.D. Ga. Feb. 7, 2019).

### c. The CFPB's interpretation is foreclosed by Dodd-Frank

In footnote 55, the CFPB takes the following positions: (1) the Dodd-Frank amendments at § 1639b(c)(3) have no effect unless they are promulgated as regulations, and (2) the CFPB may decide when, and if at all, such regulations should issue. *See* CFPB Official Interpretation, 78 Fed. Reg. 11292 n.55. For the following reasons, the Court finds that both of these interpretations are squarely foreclosed by Dodd-Frank.

Recall that § 1639b originates from Title XIV of Dodd-Frank.  Dodd-Frank "sets outs a timetable for its effective date."  *Krinsk v. SunTrust Bank*, No. 8:09-CV-909-T-27EAJ, 2012 WL 12906338, at *5 (M.D. Fla. Feb. 1, 2012).  It specifically provides that Title XIV takes effect as follows:

> (c) REGULATIONS; EFFECTIVE DATE.—
>
>> (1) REGULATIONS.—The regulations required to be prescribed under this title or the amendments made by this title shall—
>>> (A) be prescribed in final form before the end of the 18–month period beginning on the designated transfer date; and
>>> (B) take effect not later than 12 months after the date of issuance of the regulations in final form.
>
>> (2) EFFECTIVE DATE ESTABLISHED BY RULE.—Except as provided in paragraph (3), a section, or provision thereof, of this title shall take effect on the date on which the final regulations implementing such section, or provision, take effect.
>
>> (3) EFFECTIVE DATE.—A section of this title for which regulations have not been issued on the date that is 18 months after the designated transfer date shall take effect on such date.

Pub. L. 111-203 § 1400(c), 124 Stat. 1376, 2136, 15 U.S.C. § 1601 Note.

According to § 1400(c)(1)(A) of Dodd-Frank, the CFPB was obligated to prescribe regulations implementing § 1639b(c)(3) "before the end of the 18-month period beginning on the designated transfer date."  Pub. L. 111-203 § 1400(c)(1)(A).  Because the Secretary of Treasury designated July 21, 2011 as the transfer date, this meant that the CFPB was required to issue its regulations no later than January 21, 2013.  *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (identifying the July 21, 2011 transfer date and calculating 18 months out to January 21, 2013).[9]

---

[9]     The designated transfer date is defined in Section 1062 of Dodd-Frank, and the Secretary of the Treasury established July 21, 2011 as the designated transfer date pursuant to Section 1062.  *See* Designated Transfer Date, 75 Fed. Reg. 57252-02 (Sept. 20, 2010); *see also Patton v. Ocwen Loan Servicing, LLC*, No. 6:11–cv–445–Orl–19DAB, 2011 WL 3236026, at *4 n.6 (M.D. Fla. July 28, 2011)

As noted *supra*, the CFPB did not implement § 1639b(c)(3) by January 21, 2013. Purusant to § 1400(c)(3), the CFPB's failure to act made the statute itself effective without the aid of legislation. Section 1400(c)(3) commands that "[a] section of this title [i.e., Dodd-Frank] for which regulations have not been issued on the date that is 18 months after the designated transfer date shall take effect on such date." Pub. L. 111-203 § 1400(c)(3). The meaning of this provision is not subject to debate: "it is clear that under Section 1400, the issuance of final regulations (or the passage of 18 months) triggers the effective date of the statute." *Krinsk*, 2012 WL 12906338, at *6.

Thus, pursuant to § 1400(c)(3), the CFPB's failure to promulgate final regulations by January 21, 2013 meant that 15 U.S.C § 1639b(c)(3) "automatically t[ook] effect" on that date. *Duncan v. LNV Corp.*, No. CV H-11-3797, 2012 WL 13041999, at *3 n.2 (S.D. Tex. July 20, 2012) ("The Bureau has not yet promulgated final regulations. It has until January 21, 2013 to do so before the Dodd-Frank Act's RESPA amendments become automatically effective.").

Because Dodd-Frank commands this conclusion, CFPB's contrary interpretation of the statute does not persuade. Although in issuing its Official Interpretation the CFPB made a passing reference to the effective dates prescribed at § 1400(c), it decided, without explanation, that "the substantive prohibitions" of Dodd-Frank "cannot take effect until the regulations establishing them have been prescribed and taken effect," and that the CFPB might return to "prescribe such regulations in a future rulemaking." CFPB Official Interpretation, 78 Fed. Reg. 11292 n.55. Yet, by the time that the CFPB published this commentary on February 15, 2013, the statutory deadline for final rules had *already* elapsed, and the statute became "automatically effective" on the 18-month deadline in the absence of any final regulation. *Duncan*, 2012 WL 13041999, at *3 n.2.

_____

(noting that the "the designated transfer date" in § 1400(c) referred to the date set by the Secretary of Treasury as July 21, 2011).

The CFPB was mistaken that there would be "no obligation" for mortgage originators to comply with § 1639b(c)(3)(A)(i) until further rulemaking. The Court finds the CFPB Official Interpretation totally deficient of any "power to persuade," and therefore "not entitled to respect." *Skidmore*, 323 U.S. at 140.

### 4. Conclusion: Plaintiff may sue directly under the Dodd-Frank amendments to TILA

Because § 1639b(c)(3)(A)(i) went into effect on January 21, 2013, the CFPB's failure to issue final regulations does not preclude Plaintiff's claim. The Court will not grant dismissal on this ground.

### D. Residential Mortgage Loan Requirement

Marquee's next argument fares no better. It posits that Plaintiff's wrongful mortgage originator steering claim fails because § 1639b(c)(3)(A) only applies to "residential mortgage loan[s]." TILA defines a "residential mortgage loan" as a "consumer credit transaction" secured by a "dwelling" which is "primarily for personal, family, or household purposes." 15 U.S.C. §§ 1602(dd)(5); (i).

According to Marquee, Plaintiff's 2017 Loan was not a residential mortgage loan because Paragraph 9 of the 2017 Note includes a statement that the loan proceeds were intended primarily for business and commercial purpose, and not for personal, family, or household use. (ECF No. 30-1, at 5–6.)

The Court does not agree. Plaintiff has alleged that the 2017 Loan was obtained expressly for the purpose of refinancing the Eads property, i.e., Plaintiff's "primary residence." (FAC ¶ 55–56.) To initiate the mortgage process, Plaintiff submitted a "Uniform Residential Loan Application" to Marquee which advised that "all statements made in this application are made for the purpose of obtaining a residential mortgage loan." (FAC ¶ 55; ECF No. 33, at 5.) Upon receipt of the 2017 application, Marquee sent Plaintiff a bundle of loan documents, including a closing disclosure which indicated that the 2017 Loan's purpose was "refinance." (FAC ¶ 77.)

Contrary to Marquee's contentions, Paragraph 9 cannot stipulate away Plaintiff's well-documented assertion that his was a residential mortgage loan. As Plaintiff explains, Paragraph 9 was inserted on June 29, 2017 at the insistence of a Marquee representative; the Original 2017 Note which Plaintiff received on June 27, 2019 did not contain this language. (ECF No. 33, at 6.) Plaintiff agreed to its addition only after the Marquee representative assured him that the new verbiage was "just something underwriting required at the last minute," which would have no bearing on Plaintiff's intentions to use 96% of the loan proceeds to cover the loan's closing costs. (*Id.*) Moreover, Plaintiff declares under penalty of perjury that none of the 2017 Loan proceeds were used for any business and commercial purpose. (*Id.* at 7; ECF No. 33-1, at 4.)

At the motion to dismiss stage, the Court takes Plaintiff's well-pleaded allegations as true. Marquee's argument that Plaintiff's 2017 Loan was not a residential mortgage loan fails.

### E. Remaining TILA arguments from the Lender defendants

The Lender defendants have a raised a handful of trifling points which the Court will now address. Because of the perfunctory nature of Defendants' arguments, the Court's discussion will be similarly curtailed.

### 1. Invocation of the Prepayment Penalty Provision

The Lender defendants assert, without authority, that the prepayment penalty claims against them should be dismissed because they have never moved to enforce the prepayment penalty provisions against Plaintiff. (ECF No. 31-2, at 19.) But, Plaintiff correctly points out that TILA does not require the payment of prepayment penalties; it is enough if the mortgage "contains terms under which a consumer must pay a prepayment penalty." 15 U.S.C. § 1639(c)(1)(A).

### 2. Bona Fide Error

The Lender defendants also argue that they may find safe harbor in 15 U.S.C. § 1640(e). However, their attempted reliance on 15 U.S.C. § 1640(e) veers sharply toward

frivolousness. (ECF No. 31-2, at 19.) Section 1640(e) provides safe harbor to creditors for "[u]nintentional violations and bona fide errors", such as "clerical, calculation, computer malfunctioning and programing, and printing errors." There is no *ejusdem generis* canon capacious enough to shoehorn prepayment penalties, or the failure to ascertain a reasonable ability to prepay, into the bona fide error exception.

### 3. Material Disclosures

Finally, the Lender defendants argue that none of the alterations to Plaintiff's 2017 Loan documents were the kinds of "material disclosures" protected by TILA. (ECF No. 31-2, at 17.) Specifically, the Lender defendants cite *King v. State of California*, for the proposition that it is not a material nondisclosure to withhold the identity of any given creditor in a multiple creditor loan. 784 F.3d 910, 913 (9th Cir. 1986) ("[I]t is not a material nondisclosure for Integrity to fail to disclose the identity of each creditor in this transaction.").

This argument is as misguided as the last. First, Plaintiff does not ground any of his TILA claims on the alterations of the 2017 Loan documents; his TILA claims are premised on the prepayment penalty provisions and the failure of the defendants to make a reasonable inquiry into his ability to repay. Second, none of the TILA sections cited by Plaintiff require him to plead material disclosure. While other sections of the statute do have such a requirement, *see, e.g.*, 15 U.S.C. § 1602(v) (defining "material disclosures"); § 1639(a) ("Disclosures"), Plaintiff has not sought to invoke any of them.

### F. Conclusion: TILA claims

Although the defendants raised many objections to Plaintiff's TILA claims, none of them were availing. Accordingly, the Court will not grant dismissal with respect to Plaintiff's first cause of action.

## V. Cause of Action 2: Declaratory Judgment

Plaintiff's second cause of action is styled as a request for declaratory relief. Plaintiff seeks a determination that the alterations to the true 2017 Loan documents rendered the Dropbox 2017 Note and Recorded 2017 Deed "void ab initio" and without

legal effect.  (ECF No. 13, at 20.)  He also requests "[t]he Court order full reconveyance of the Property to the Family Trust."  (*Id.*)

### A. The Parties' contentions

The Lender defendants construe Plaintiff's request for reconveyance as a claim for rescission under TILA.  (ECF No. 31-2, at 20.)  They argue that TILA requires Plaintiff to "allege [the] ability to tender the amount owed on the loan as a prerequisite to rescission," *Lal v. American Home Servicing*, 680 F. Supp. 2d 1218, 1222 (E.D. Cal. 2010), and that Plaintiff's claim fails because he has not alleged any ability to tender the payment due.

Plaintiff counters that his claim for reconveyance is not brought pursuant to TILA, but rather, the common law rule voiding improperly altered deeds stated in cases like *Lin v. Coronado*, 232 Cal. App. 4th 696 (2014).  In response, the Lender defendants argue that Plaintiff finds no refuge in *Lin* because its rule applies only where there are "material" alterations.

### B. Plaintiff's second cause of action rests on California law, not TILA

As a preliminary matter, the Court finds that Plaintiff's second cause of action is not premised on any of the TILA violations described in his first cause of action.  Instead, the Court agrees with Plaintiff that his second cause of action derives from his allegations that his 2017 Loan documents were altered after he signed and returned to Marquee the Emailed 2017 Note and the Emailed 2017 Deed.

Because Plaintiff seeks rescission under the alteration theory in *Lin*, and not based on TILA violations, Lender defendants' argument that tender is mandatory under TILA is misplaced.  In any event, and as Lender defendants' own cited authority confirms, rescission under TILA does not categorically demand tender.  *See Yamamoto v. Bank of New York*, 329 F.3d 1167, 1172–73 (9th Cir. 2003) (holding that courts have the discretion to require tender before permitting rescission under TILA, and that the same

"must be determined on a case-by-case basis, in light of the record adduced"). Thus, the Lender defendants' argument as to TILA tender fails.

## C. Plaintiff need not allege tender because the deed is void

At same time, this determination as to TILA does not completely resolve the issue, since rescission under California law also requires tender. *See* CAL. CIV. CODE § 1691 (rescission requires the moving party to "[r]estore to the other party everything of value which he has receive from him under the contract or offer to restore the same upon condition that the other party do otherwise").

However, the duty to tender is somewhat flexible,[10] and courts have recognized that tender is excused when the underlying contract is void. *See, e.g.*, *Page v. Preuss*, 226 Cal. App. 2d 494 (1964) (buyer under invalid conditional sale contract for sale of truck and trailer may recover without offering to restore benefits received); *Martinez v. America's Wholesale Lender*, 446 F. App'x 940, 943 (9th Cir. 2011) (unpublished) (holding that "the tender rule does not apply to a void, as opposed to a voidable, foreclosure sale"). As relevant here, "[c]ourts have found that tender is not required where the borrower attacks the validity of the underlying debt," and where the "deed is void on its face." *Kalnoki v. First Am. Tr. Servicing Sols., LLC*, 8 Cal. App. 5th 23, 47 (2017) (citing first *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957), and then *Dimock v. Emerald Props.*, 81 Cal. App. 4th 868, 878–88 (2000)).

Plaintiff urges that the 2017 Loan documents are void pursuant to *Lin*. In *Lin*, the California Court of Appeals examined the long-established common law rule that "when a deed is altered or changed by someone other than the grantor before it is delivered or recorded, and the alteration is without the grantor's knowledge or consent, the deed is

---

[10] CAL. CIV. CODE § 1693 ("A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief based upon rescission shall not denied relief because of a delay in restoring or in tendering restoration of such benefits before judgment unless such delay has been substantially prejudicial to the other party; but the court may make a tender of restoration a condition of its judgment.").

void and no title vests in the grantee or subsequent purchasers." 232 Cal. App. 4th at 703 (citing 3 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 8:53, p. 8–145). To invoke the rule, the alteration must be sufficiently material: "the only alterations which will affect the validity of an instrument are those which are material; that is, alterations which change the legal effect of the document." *Id.* (quoting 3 American Law of Property (2nd printing 1974) § 1285, p. 365). "The test for determining the materiality of an alteration is not whether the liability of the either of the parties is increased or reduced as a result but whether the instrument has the same legal effect after the alteration as it had before." *Id.* at 704 (quoting 30 Williston on Contracts (4th ed. 2004) § 75:12 p. 83).

Applying *Lin*, the Court concludes that Plaintiff has sufficiently alleged that the Recorded 2017 Deed is void. Plaintiff alleges that several alterations were made to the Emailed 2017 Deed after he signed the document, but before delivery to the grantors and recordation by Marquee. Moreover, the alterations were not of a de minimis nature. The Recorded 2017 Deed includes names of beneficiaries not named in the Emailed 2017 Deed, assigns them different ownership and interest percentages, and purports to be made with respect to a different description of the Eads property.[11] Each one of these alterations is material on their own, since all three alterations change "the legal effect of the document." *Id.*

The Lender defendants argue that the alterations alleged by Plaintiff are comparable to the ones found immaterial by the court in *Lin.* (ECF No. 35, at 11.) However, the Court does not think any factual analogy to *Lin* is appropriate.

In *Lin*, the court was faced with a situation where the original deed specified a 75% interest to one entity (River Forest) and 25% to another (Elevation), but also named Lin, the plaintiff, "as a grantee without any stated percentage interest in the property." *Id.* at

---

[11]     Recall that the Emailed 2017 Deed of Trust was made with reference to the entirety of the Eads property, which, according to attachment Exhibit A thereto, encompassed Parcels 1A, 1B, 2A, 2B, 3A, and 3B; the Recorded Deed of Trust narrowed the property conveyed to only "Parcels 1A, 1B and 2B."

675.  Lin sued for reformation after discovering that the recorded deed only listed the two other parties with the 75% and 25% interests as owners.  In that context, the court declined to find a material change because Lin never took any ownership interest under the original deed.  Differently put, since the original deed granted Lin 0% ownership interest, her exclusion from the recorded deed affected no change in position; as a result, "the alleged alteration of the deed was, as a matter of law, not material." *Id.* at 703.

Unlike *Lin*, the liabilities of the parties are not static under the original and altered instruments.  As discussed *supra*, there are significant legal differences between the terms of the original Emailed 2017 Deed and the altered Recorded 2017 Deed.  At the risk of stating the obvious, an altered deed, which names different beneficiaries, who take interests differently, as to a different parcel of land, does not have "the same legal effect after the alteration as it had before." *Id.*  Indeed, as evidenced by an unpublished opinion[12] by the Court of Appeals in *Yanez v. Kler*, alterations which modify the property conveyed are material, and void the deed.  No. E067499, 2018 WL 41409947, at *4–*5 (Cal. Ct. App. Aug. 30, 2018) (upholding under *Lin* the trial court's ruling that a deed was void because "Exhibit A to the grant deed," which purported to convey a "Parcel 2," "was added to the grant deed after Yanez and his wife signed the grant deed" as to Parcel 1).  This conclusion obtains even in this case, where the altered instrument theoretically limits Plaintiff's liability (the signed deed implicates the entirety of the Eads property but the allegedly-altered deed pertains only to several of its parcels).  This is because "the test for determining the materiality of an alteration is not whether the liability of the either of the parties is increased or reduced as a result." *Lin*, 232 Cal. App. 4th at 703.

---

[12]    Federal courts "may consider unpublished state decisions, even though such opinions have no precedential value." *Employers Ins. of Wausau v. Granite State Ins. Co*., 330 F.3d 1214, 1220 (9th Cir. 2003) (citing *Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997)).

Plaintiff has sufficiently alleged that the Recorded 2017 Deed is void, and as a result, his rescission claim is not defeated by a failure to allege tender. The Lender defendants' motion to dismiss Plaintiff's second cause of action is accordingly **denied**.

## VI.    CONCLUSION

No argument presented in either Marquee's or the Lender defendants' motions convince the Court that dismissal of Plaintiff's first amended complaint is warranted. Both motions are hereby **DENIED**. [ECF Nos. 30, 31.]

**IT IS SO ORDERED**.

Dated: August 20, 2019

Hon. Gonzalo P. Curiel
United States District Judge

19-CV-00390-GPC-MDD