1
2
3
4
5
6
7
8
9         UNITED STATES DISTRICT COURT
10        SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| DALE SUNDBY,<br><br>                              Plaintiff,<br><br>v.<br><br>MARQUEE FUNDING GROUP, INC., et al.,<br><br>                              Defendants. | Case No.: 3:19-CV-0390-GPC-AHG<br><br>**ORDER**<br><br>**1. GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT WITNESS; AND**<br><br>**2. GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.**<br><br>**[ECF Nos. 164, 165, 166, 167.]** |

On June 30, 2020, Plaintiff Dale Sundby filed an amended motion for summary judgment, or in the alternative partial summary judgment, and a motion to limit Defendants' expert. ECF Nos. 165, 166. On June 30, 2020, Defendant Marquee Funding Group ("MFG") also filed its motion for summary judgment. The remaining defendants

1

too filed a motion for summary judgment, or in the alternative partial summary judgment. ECF Nos. 164, 167.

For the reasons discussed below, the Court **GRANTS IN PART and DENIES IN PART** Plaintiff's motions for summary judgment and to limit an expert opinion. The Court also **GRANTS IN PART and DENIES IN PART** Defendants' motions for summary judgment.

## I.      Background

### A. Statutory Background & Claims

"Congress enacted [the Truth in Lending Act] TILA 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (quoting 15 U.S.C. § 1601). To effectuate TILA's purpose, a court must construe "the Act's provisions liberally in favor of the consumer" and require absolute compliance by creditors. *In re Ferrell*, 539 F.3d 1186, 1189 (9th Cir. 2008); *see also Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir.1989) ("Even technical or minor violations of TILA impose liability on the creditor.").

"Historically, Regulation Z of the Board of Governors of the Federal Reserve System (Board), 12 CFR part 226, has implemented TILA." *Fowler v. U.S. Bank, Nat. Ass'n*, 2 F. Supp. 3d 965, 976 (S.D. Tex. 2014) (quoting Truth in Lending (Regulation Z), 76 Fed. Reg. 79768, 79768 (Dec. 22, 2011)). "[T]he Dodd-Frank Act transferred rule making authority for TILA to the [Consumer Finance Protection Bureau] CFPB, effective July 21, 2011." *Id.* at 977 (quotation marks, citation, and alterations in the original omitted) (citing Designated Transfer Date, 75 Fed. Reg. 57252 (Sept. 20, 2010)). The CFPB's subsequent regulations were codified in 12 C.F.R. § 1026 *et seq.* and prescribed an effective date of January 10, 2014. *Id.* The CFPB has also issued "Official

2

Interpretations," also known as "Staff Commentary," alongside its final rules to facilitate the implementation of TILA. *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 242 (4th Cir. 2019); *see also, e.g.*, Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11280 (Feb. 15, 2013).

TILA and its corresponding regulations apply to consumer credit transactions. *Gilliam, Tr. of Lou Easter Ross Revocable Tr. v. Levine, Tr. of Joel Sherman Revocable Tr.*, 955 F.3d 1117, 1120 (9th Cir. 2020). "For a loan to qualify as a consumer credit transaction under the statute, a borrower must demonstrate that the loan was extended to (1) a natural person, and was obtained (2) 'primarily for personal, family, or household purposes.'" *Id.* (quoting 15 U.S.C. § 1602(i)).

TILA, moreover, provides a private right of action, 15 U.S.C. § 1640(a), to all "consumers who suffer damages as a result of a creditor's failure to comply with TILA's provisions" so that the Act may be broadly enforced. *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 235 (2004). Section 1640(a) permits recovery of actual damages, statutory damages, costs, and attorneys' fees, and, as relevant here, may be used as a basis for a claim against "any creditor who fails to comply with any requirement imposed under [15 U.S.C. §§ 1631–1651]." *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 433 (3d Cir. 2018). TILA also creates liability for mortgage originators under 15 U.S.C. § 1639b(d)(1).

Here, Plaintiff has alleged Defendants' violation of several TILA provisions actionable under Section 1640. First, Plaintiff moves for summary judgment against the 2016 Lender Defendants for three violations of TILA with respect to the 2016 promissory note: the inclusion of a prepayment penalty under 15 U.S.C. § 1639(c)(1)(A), the inclusion of a balloon payment under 15 U.S.C. § 1639(e), and a failure to abide by the ability-to-repay provisions under 15 U.S.C. § 1639c(a). Second, Plaintiff moves for summary judgment against the 2017 Lender Defendants for the same three violations of TILA with respect to the 2017 promissory note. Lastly, Plaintiff moves for summary

judgment against Defendant MFG for two related violations: steering Plaintiff towards a residential mortgage he lacked a reasonable ability to repay under 15 U.S.C. § 1639b(c)(3), and a failure to abide by the ability-to-repay provisions of 15 U.S.C. § 1639c(a).

### B. Factual Background

#### 1. The 2016 Loan

In March of 2016, Plaintiff and his spouse, Mrs. Edith Littlefield Sundby, applied as co-borrowers for a refinancing of the mortgage on their home at 7740 Eads Avenue (the "Property"). ECF No. 165-6 at 1–6. Among other information, the application included that neither borrower was employed, that the "Purpose of Loan" was to "Refinance," and that the Property would be the borrowers' "Primary Residence." *Id.* at 2, 3. The application also noted that the home was encumbered with nearly $2.2M in mortgage debt, and that the borrowers "intend[ed] to occupy the property as [their] primary residence." *Id.* at 4, 5. Other than this information, the application does not include any income or asset information from the borrowers. *Id.* at 1–6. As a part of the application process, Plaintiff and Mrs. Sundby also signed a statement on March 15, 2018 stating, "I understand and hereby certify that I WILL occupy the property that will secure the loan ('Security Property') as my primary residence . . . ." ECF No. 196-1 at 76.

The application names Defendant Marquee Funding Group ("MFG")[1] as the loan originator. ECF No. 165-6 at 5. In connection with the loan, Dale and Edith Sundby

---

[1] Defendant MFG meets the definition of mortgage originator under TILA. A mortgage originator is "any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain -- (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiates terms of a residential mortgage loan." 15 U.S.C. § 1602(dd)(2)(A). Plaintiff alleges that Defendant MFG is a mortgage originator as to both loans. ECF No. 13 at ¶¶ 131(g), 132(g). Though Defendant MFG denies this in its Answers, it appears to concede as much in their papers. ECF No. 48 at ¶¶ 131(g), 132(g); ECF No. 167-2 at 13.

executed a promissory note, dated March 29, 2016, in their capacities as Trustees to their real estate Trust that included a promise to pay $2,600,000 to the 2016 Lender Defendants by May 1, 2017.[2] ECF No. 164-5 at 37–41. On April 6, 2016, the 2016 Note was funded and interest "commenced" accruing. *Id.* at 23, 38; ECF No. 196-1 at 105. The Note was then updated on March 31, 2016 to reflect an agreement between the borrowers and the lenders to prepay 11 months of interest through the loan transaction. ECF No. 164-5 at 41.

The Note, moreover, contains several clauses which form the basis of Plaintiff's claims under TILA. At Paragraph 3, the Note states that a single payment of $2,621,666.67 is due on May 1, 2017. *Id.* at 38. At Paragraph 5, the Note states that, if the Borrower pays the principal down on the loan before it is due, then the Borrower also "agree[s] to pay a prepayment penalty computed as follows: Borrower agrees to pay the Lender a Minimum of 90 days interest from the day of this loan funding." *Id.* at 38.

Dale Sundby and Edith Sundby also executed a Deed of Trust in connection with the 2016 loan on March 30 and 31, 2016, which was then recorded with the San Diego County Recorder on April 7, 2016. ECF No. 164-5 at 28–46. Plaintiff's 2016 Final Settlement Statement details the charges associated with obtaining and processing Plaintiff's loan. ECF No. 165-6 at 23. These include, for example, about $18,000 charged to Plaintiff as "[i]nterest" for funding the loan on April 6, 2016 instead of May 1, 2016, as well as insurance payments, fees, and other costs. *Id.*

---

[2] The 2016 and 2017 Lender Defendants meet the definition of "creditors" under TILA with respect to the loans they funded. A "creditor" is a "person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 C.F.R. § 1026.2; *see also* 15 U.S.C. § 1602(g). Plaintiff alleges that the Lender Defendants are creditors for the 2016 and 2017 loans, ECF No. 13 at ¶¶ 131(f), 132(f), and Lender Defendants do not deny the allegation. ECF Nos. 45 at ¶¶ 131(f), 132(f); ECF No. 49 at ¶¶ 131(f), 132(f).

Prior to completing the loan process, on March 25, 2016, Plaintiff informed R.J. Solovy, Vice President of Defendant MFG, by email that the Property would "be listed for sale no later than April 1, 2016." ECF No. 196-1 at 79. On April 12, 2016, Plaintiff informed Mr. Solovy via email that he had "authorized the continued listing" after speaking with his agent and that they agreed the Property would be "showable" after "additional cleaning and prep" that week. *Id.* at 80.

Later, during the pendency of the 2016 loan, Plaintiff and his spouse leased a townhouse on the Property through two month-to-month lease agreements, one beginning on October 24, 2015 and the other beginning on April 1, 2016. ECF No. 196-1 at 131, 142–46. Plaintiffs collected $37,056 rental income from April 6, 2016 to May 1, 2017. *Id.*; ECF No. 182-1 at ¶ 8.

## 2. The 2017 Loan

On May 17, 2017, Dale Sundby and Edith Sundby applied for a second loan to refinance the Property. ECF No. 196-1 at 110–15. Among other information, the application again noted that neither borrower was employed, that the "Purpose of Loan" was to "Refinance," and that the Property would be the borrowers' "Primary Residence." *Id.* at 111–12. The application also noted that the home was encumbered with about $2.6M in mortgage debt, and that the borrowers "intend[ed] to occupy the property as [their] primary residence." *Id.* at 113–14. Lastly, this application included a summary of the borrowers' income, including $3,200 in net rental income and $4,000 in social security, disability, and pension payments. *Id.* at 112. Defendant MFG again originated the loan. *Id.* at 114.

On June 29, 2017, Dale Sundby and Edith Sundby executed a promissory note in connection with the 2017 loan in their capacities as Trustees to their real estate Trust that included a promise to pay $3,160,000 to the 2017 Lender Defendants by July 8, 2018. ECF No. 164-5 at 53–60. Three versions of this document exist: the 2017 Original Note, ECF No. 165-6 at 10–14, the 2017 MFG Note, ECF No. 164-5 at 53–60, and the 2017

6

Original Note. ECF No. 30-1 at 37. The 2017 MFG Note states that the loan's "[i]nterest commences on 07/07/2018" and that the loan's "Due Date" is "07/08/2017." ECF No. 164-5 at 54. The 2017 Original Note states that the loan's "[i]nterest commences on 07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 165-6 at 12. Lastly, the 2017 Fine Note states that the loan's "[i]nterest commences on 07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 30-1 at 37. The loan was funded on July 5, 2017. ECF No. 164-3 at ¶ 13.

The 2017 Notes, moreover, contain several notable clauses. At Paragraph 3, the 2017 Notes state that a single payment of $3,185,016.67 is due on July 8, 2018. ECF No. 164-5 at 57; ECF No. 165-6 at 12. At Paragraph 5, the 2017 Notes state that, if the Borrower pays the principal down on the loan before it is due, then the Borrower also "agree[s] to pay a prepayment penalty computed as follows: If this loan is paid off or refinanced during the Six (6) month(s) of the term, a prepayment penalty equal to the difference between Six (6) month(s) of interest and the date of the prepayment shall be due tendered." ECF No. 164-5 at 58; ECF No. 165-6 at 14. And, at Paragraph 9, the Note states that "Loan Proceeds are intended to be used primarily for business and commercial purpose and are not intended to be used for personal, family, or household purpose or in any manner which may result in the loan Transaction not being exempt from Truth in Lending Act . . ." ECF No. 164-5 at 55; ECF No. 165-6 at 14.

Dale Sundby and Edith Sundby also executed a Deed of Trust in connection with the 2017 loan on June 28 and 29, 2017. ECF No. 165-6 at 15–22 ("Original 2017 Deed"). Defendant MFG then made several alterations to the 2017 Deed, including (1) that the new deed "did not contain initials on the bottom of the first page," (2) that the Borrower was defined differently with the added language "as to Parcels, 1A, 1B and 2B," and (3) that the Lenders were defined differently as "Steven M. Cobin and Susan L. Cobin, Trustees of the Cobin Family Trust Dated March, 9th 1984, as to an undivided 7.911% interest" was added and then "Equity Trust Company Custodian FBO Steven M. Cobin

Traditional IRA" was reduced from 15.823% to 7.911%. ECF No. 165-2 at 17. It is undisputed that these changes were created "only" by two of MFG's escrow officers, who subsequently informed Mr. Solovy. ECF No. 179-1 at ¶¶ 22–27. MFG then recorded the Altered Deed with the San Diego County Recorder on July 7, 2017. ECF No. 164-5 at 43–52 ("Altered 2017 Deed").

The Escrow Closing Statement for 2017 loan filed by Defendant MFG details the charges associated with obtaining and processing Plaintiff's 2017 loan. ECF No. 196-1 at 122. Of the $3,160,000 funded to the loan, about $128,000 were paid directly to the Borrower. *Id.* (stating "Check to Borrower"). In addition, the escrow statement reflects an additional "[i]nterest charge" of $833.89.[3] *Id.* Other charges include various fees, delinquent property taxes, and commissions to the broker. *Id.*

Prior to completing the loan documents, on May 4, 2017, Plaintiff informed Mr. Solovy that he was looking into a condominium map for the Property. ECF No. 196-1 at 83. Plaintiff shared a schedule of time and costs prepared by an architect for obtaining a condominium map, including a summary of the architect's meeting notes with a City of San Diego representative. *Id.* at 82–87. Then, on June 30, 2017, Plaintiff provided Mr. Solovy with additional information as to the project, including that the condominium map timeline was 10 months, that Sotheby's believed the condominium map would help sell the property by reaching a larger audience of buyers, and that Plaintiff intended to continue marketing the Property as a single unit. *Id.* at 92. In the end, Plaintiff did not receive approval for a condominium map from the City. ECF No. 196-1 at 5.

During the pendency of the 2017 loan, Plaintiff and his spouse continued to lease a townhouse on the Property, as evidenced by two month-to-month lease agreements beginning on January 13, 2017 and May 1, 2017. ECF No. 196-1 at 131, 147–55.

---

[3] The record also contains a similar escrow closing statement related to the 2017 loan that is not marked as an "estimate" and that was filed by the Plaintiff. ECF No. 165-6 at 24.

Plaintiffs collected $38,612 rental income from July 7, 2017 to July 8, 2018. *Id.*; ECF No. 182-1 at ¶ 17.

### C. Procedural Background

On March 30, 2020, Plaintiff filed a motion for summary judgment. ECF No. 105. On April 14, 2020, the Court granted Defendants' motion to continue the hearing as to Plaintiff's motion for summary judgment to complete additional discovery, including depositions of Plaintiff and his spouse. ECF Nos. 110, 111, 120.

On June 30, 2020, Plaintiff filed an amended motion. ECF No. 165. Plaintiff also filed a motion seeking to exclude expert testimony from Defendants' expert, Jay Hibert. ECF No. 166. Defendants also filed motions for summary judgment on June 30, 2020, one by Defendant MFG, ECF No. 167, and the other by the Lender Defendants. ECF No. 164. The Lender Defendants' motion for summary judgment relies on a number of declarations, including that of Jay Hibert.

On July 24, 2020, Defendants responded to Plaintiff's motion for summary judgment and motion to exclude their expert. ECF Nos. 179, 180, 181. Plaintiff likewise filed responses to Defendants' motions for summary judgment. ECF Nos. 182, 183.

On August 7, 2020, Defendants filed replies as to their motions for summary judgment. ECF Nos. 192, 194. Plaintiff likewise filed replies to his summary judgment motions. ECF No. 193, 195. Plaintiff did not file a reply in his motion to exclude Defendants' expert. On September 10, 2020, the Court held a hearing on the motions.

## II.    Legal Standard on Summary Judgment

Federal Rule of Civil Procedure ("Rule") 56 empowers courts to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted) (emphasis in original). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 247). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325.

1   When evaluating a motion for summary judgment, the court must "view[] the

2   evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262

3   F.3d 871, 876 (9th Cir. 2001). The court may not, however, engage in credibility

4   determinations, weighing of evidence, or drawing of legitimate inferences from the facts

5   as those functions are for the trier of fact. *Anderson*, 477 U.S. at 255. Accordingly, if

6   "reasonable minds could differ as to the import of the evidence," summary judgment will

7   be denied. *Anderson*, 477 U.S. at 250–51.

8   **III.   Plaintiff's Motion to Exclude Defendants' Expert**

9        **A. Applicable Law**

10        The trial judge must act as the gatekeeper for expert testimony by carefully

11   applying Federal Rule of Evidence ("FRE") 702 to ensure specialized and technical

12   evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509

13   U.S. 579, 589 & n. 7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137,

14   147 (1999) (observing that *Daubert* imposes a special "gatekeeping obligation" on the

15   trial judge). An expert witness may testify "if (1) the testimony is based upon sufficient

16   facts or data, (2) the testimony is the product of reliable principles and methods, and (3)

17   the witness has applied the principles and methods reliably to the facts of the case." Fed.

18   R. Evid. 702. The proponent of the evidence bears the burden of proving that the expert's

19   testimony satisfies FRE 702. *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007).

20        FRE 702, moreover, only allows expert testimony if it "will help the trier of fact to

21   understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert

22   testimony is helpful "when it provides information beyond the common knowledge of the

23   trier of fact." *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002). Expert

24   testimony may also embrace the ultimate issue. Fed. R. Evid. 704(a).

25        On the other hand, "[a]n expert witness cannot give an opinion as to her *legal*

26   *conclusion*, i.e., an opinion on an ultimate issue of law." *United States v. Boulware*, 558

27   F.3d 971, 975 (9th Cir. 2009) (quotation omitted) (emphasis in original). Legal

28

conclusions are not normally "helpful" and should be excluded. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). A Court acts "well within its discretion" in excluding such evidence. *Boulware*, 558 F.3d at 975.

### B. Analysis

Here, Plaintiff principally challenges Defendant's Expert, Jay Hibert, on the basis that (1) his testimony would not help the trier of fact to understand the evidence or to determine a fact in issue, and (2) his report contains several legal conclusions. ECF No. 66 at 4. Defendant responds that Mr. Hibert's conclusions are not objectionable and Mr. Hibert is qualified under FREs 702 and 703. ECF No. 188. The Court concludes that Mr. Hibert is a qualified expert but declines to consider the legal conclusions offered in his report as they are unhelpful and "'usurp the court's role' of defining the applicable law." *Moreno v. Ross Island Sand & Gravel Co.*, No. 2:13-CV-00691-KJM, 2015 WL 5604443, at *7 (E.D. Cal. Sept. 23, 2015) (quoting *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)).

Mr. Hibert generally meets the requirements of FRE 702. Mr. Hibert has 35 years' experience in the financial services industry and has worked at several, large financial institutions, including Bank of America, Union Bank of California, and Mellon Bank. ECF No. 180-1 at 10, 24, 25. Mr. Hibert's report summarizes his experience and sets out the documents he reviewed in reaching his conclusions. ECF No. 180-1 at 9. And, the Court concurs with Defendants that many jurors may have "little to no experience with the issue of originating and documenting mortgage loans," such that the testimony of an expert with Mr. Hibert's experience would assist the trier of fact in understanding this case. ECF No. 180 at 9. Mr. Hibert's testimony, moreover, has been accepted by more two dozen other courts in the last four years. ECF No. 180-1 at 22, 23. As such, the court finds that Mr. Hibert is capable of testifying as an expert on mortgage loans given his experience working on "hundreds of real property transactions" over the course of his career. *Id.* at 15.; *see Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814

(9th Cir. 2014) (holding that trial court abused its discretion in determining witness with 38 years of experience in property damage repair was not qualified as an expert); *Hangarter*, 373 F.3d at 1015 (holding that 25 years of experience in the insurance industry qualified expert to testify about claims adjustment standards).

However, the Court finds that much of Mr. Hibert's report here will not "help the trier of fact to understand the evidence or to determine a fact in issue" because it is replete with legal conclusions. Fed. R. of Evid. 702(a). For example, Mr. Hibert concludes seven times that the 2016 and 2017 loans are "exempt from" certain provisions of TILA, including because both loans are "bridge loans" within the meaning of TILA. ECF No. 166 at 30–31. Mr. Hibert likewise offers that a borrower "can only have one primary residence" within the meaning of TILA. *Id.* Mr. Hibert further concludes that the 2017 loan is a "business purpose loan" with reference to "Section 1026.3" and other regulations. *Id.* at 31. And, Mr. Hibert offers that the changes between the 2017 loan documents "were not material in any way," with reference to the FDIC's "rules and regulations" as well as other uncited regulations issued by the California Departments of Real Estate and of Business Oversight. *Id.* at 32.

Each of these conclusions is impermissible because it amounts to an interpretation of a contract (i.e., the loan documents) or the applicability of a statute (e.g., TILA, its corresponding regulations, and various state laws). *See In re Butler*, 512 B.R. 643, 655 (Bankr. W.D. Wash. 2014), *aff'd*, 550 B.R. 860 (W.D. Wash. 2015) (rejecting expert's opinion as to who was the "beneficiary, holder, or owner of the subject" loan as an improper legal conclusion); *see also Leffridge v. Nationstar Mortg.*, LLC, No. ED-CV-14-01940-JAK, 2015 WL 12681307, at *5 (C.D. Cal. Nov. 19, 2015) (rejecting expert opinion as to "whether there was a transfer of an interest in the Note" because it was an inadmissible legal conclusion); *Aubrey v. Barlin*, No. 1:10-CV-076-DAE, 2015 WL 6002260, at *13 (W.D. Tex. Oct. 14, 2015) (rejecting expert's opinions because his "conclusions amount to [the] application of the facts to the relevant securities laws");

*FNB Bank v. Park Nat. Corp.*, 996 F. Supp. 2d 1187, 1192 (S.D. Ala. 2014) (rejecting an expert's statements interpreting a contract as impermissible legal conclusions).

These opinions do more than merely define terms of a "technical nature," ECF No. 188 at 7 (quoting *Nucor Corp. v. Nebraska Pub. Power Dist.*, 891 F.2d 1343, 1350 (8th Cir. 1989)), or provide information on industry standards or practice. *Id.* at 6 (quoting *Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 344 (8th Cir. 2009)). Mr. Hibert's report instead purports to define terms which have "a specialized meaning" in the context of TILA, including a "bridge loan" or a "commercial purpose" loan, and to instruct the reader on "how to apply the law to the facts of the case." *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017). As such, Mr. Hibert's above cited opinions are impermissible legal conclusions and usurp the role of the Court.

Consequently, the Court declines to consider any of the legal conclusions reached by Mr. Hibert's report in ruling on the pending motions for summary judgment. To the extent the Court refers to Mr. Hibert's report, it does so only as to his factual assertions. Afterall, "[a] court may admit expert testimony of business customs and practices . . . ." *Milton H. Greene Archives, Inc. v. BPI Communications, Inc.*, 378 F. Supp. 2d 1189, 1198 n.9 (C.D. Cal. 2005).

## IV.   Plaintiff's First Cause of Action under TILA

### A. Whether TILA Applies to Plaintiff's Loans

As a starting point, the Court addresses Defendants' arguments that TILA does not apply to the first cause of action. Specifically, Defendants argue that loans are not covered by TILA for three reasons: (1) that loans to trusts are excluded from TILA, (2) that Plaintiff obtained the loans for a commercial purpose, and (3) that the loans are exempt as bridge loans. For the reasons below, the Court finds that TILA applies.

#### 1.   TILA Applies to the Sundby Trust's Loans.

Defendant MFG argues that the 2016 and 2017 loans are not protected by TILA because the Sundby Trust is an organization, and not a "natural person," within the

meaning of TILA. ECF No. 167-2 at 10–11. Plaintiff responds that a trust and its trustees are the same person for the purposes of TILA. ECF No. 183 at 3–4. Because MFG's argument is premised on a misunderstanding of current law, the argument fails.

Defendant argues that the CFPB Staff Commentary that supports Plaintiff's position does not "retroactively make Plaintiff's loan subject to TILA." This contention is contrary to *Gilliam, Tr. of Lou Easter Ross Revocable Tr. v. Levine, Tr. of Joel Sherman Revocable Tr.* ("*Gilliam*"), 955 F.3d 1117, 1120 (9th Cir. 2020). In *Gilliam*, the Ninth Circuit found that a 2016 loan to a trust, secured by the primary residence of the trust's beneficiary, qualified as a consumer credit transaction protected by TILA because the loan was obtained for a consumer purpose: to make repairs to the residence so that the beneficiary could live there. *Id.* at 1120, 1123. The Ninth Circuit reached this conclusion in reliance on the CFPB's current Staff Commentary, even though the plaintiff obtained the subject loan in 2016 before this Commentary went into effect. *Id.* (quoting 12 C.F.R. Pt. 1026, Supp. 1, Comment 3(a)-10.i.); *see Amendments to Federal Mortgage Disclosure Requirements Under the Truth in Lending Act (Regulation Z)*, 82 Fed. Reg. 37656 (August 11, 2017).

*Gilliam* relied, in part, on *Amonette*. *See Gilliam*, 955 F.3d at 1120; *Amonette v. IndyMac Bank, F.S.B.*, 515 F. Supp. 2d 1176 (D. Haw. 2007). In *Amonette*, the court concluded that a loan secured by the borrower's principal residence was protected by TILA as a consumer credit transaction even though the plaintiff had conveyed the property to her revocable living trust because plaintiff was the "settlor, trustee, and beneficial owner" of the trust, and thus "effectively owned the property" held by the trust. *Id.* at 1178, 1181, 1183, 1185 (quoting *United States v. Stolle*, No. CV 99–00823, 2000 WL 1202087, at *5 (C.D. Cal. Feb. 14, 2000)). The *Amonette* Court relied on Staff Commentary to Regulation Z which treated certain credit extended to land trusts as a consumer transaction and provided that a "trust and its trustee are considered to be the same person . . . ." *Id.* at 1183; *see Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d

401, 417 (9th Cir. 2011) (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)) (stating that official staff interpretations, i.e., Staff Commentary, of Regulation Z are controlling "[u]nless demonstrably irrational"). As *Gilliam* later observed, the "decision in *Amonette* correctly anticipated the most recent Commentary to Regulation Z, which expressly provides that loans to trusts, set up by individuals for tax and estate planning purposes, should be considered consumer credit transactions." *Gilliam*, 955 F.3d at 1121. Because *Amonette*'s facts are analogous, and Plaintiff's Trust has evidently been used for "estate planning purposes," the Court finds it persuasive. *Id.*

Consequently, Defendant MFG's argument fails as contrary to *Gilliam* and *Amonette*. The Court turns next to whether the Sundby Trust loans were obtained for a commercial or business purpose.

### 2. The Sundby Trust's Loans are Not Commercial.

"Whether [a credit transaction] is for a personal or a business purpose requires a case by case analysis." *Thorns v. Sundance Properties*, 726 F.2d 1417, 1419 (9th Cir. 1984). "[A] court must look at the entire transaction and surrounding circumstances to determine a borrower's primary motive." *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010). Courts typically analyze five factors:

(1) The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

(2) The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

(3) The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

(4) The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

(5) The borrower's statement of purpose for the loan.

*Daniels v. SCME Mortg. Bankers, Inc.*, 680 F. Supp. 2d 1126, 1129 (N.D. Cal. 2010) (citation omitted); *see also* 12 C.F.R. Pt. 1026, Supp. I, Comment 3(a)-3i. Plaintiff bears

the burden of showing that a disputed transaction is "a consumer credit transaction, not a business transaction." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 751 (3d Cir.), *cert. denied*, 419 U.S. 885 (1974).

The question of whether a "loan actually was for a purpose covered by TILA" is a "factual issue[]." *Thorns*, 726 F.2d at 1419. Nonetheless, courts grant motions for summary judgment as to the purpose of a loan "[w]here the relevant facts are not in dispute." *Sherlock v. Herdelin*, No. CIV-A-04-CV-3438, 2008 WL 732146, at *9 n.14 (E.D. Pa. Mar. 17, 2008), *aff'd*, 434 F. App'x 57 (3d Cir. 2011) (quoting *Gombosi v. Carteret Mortg. Corp.*, 894 F. Supp. 176, 182 (E.D. Pa. 1995)); *see also, e.g.*, *Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 704 (9th Cir. 1986) (affirming district court's grant of summary judgment to Plaintiff for a TILA rescission claim and award of attorneys' fees); *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 156 (E.D.N.Y. 2010) (granting defendant summary judgment where "it [was] uncontroverted that plaintiff obtained the . . . mortgages . . . for investment purposes, used non-owner occupied rental property as security for the loans, and has failed to point to any evidence indicating that the loans were obtained for a personal purpose"); *Goff v. Utah Funding Commercial, Inc.*, No. 2:09-CV-00680, 2009 WL 4665800, at *3 (D. Utah Dec. 2, 2009) (granting defendant summary judgment where the loan was secured by a business and used to pay business debts, and where plaintiff stated the loan would be used for a business or commercial purpose only).

Here, Defendants argue that "the evidence shows that Plaintiff's 2016 and 2017 Loans represented 'business' or 'commercial' purpose loans exempt for (sic) TILA requirements." ECF No. 164-2 at 19. Plaintiff responds that the evidence, instead, supports a finding that the loans were obtained for personal purposes. ECF No. 182 at 4. The Parties present no genuine disputes as to a material fact, and instead disagree as to the holding to be drawn from the undisputed facts. On this record, and given the Parties'

arguments, the Court holds that both the 2016 and 2017 loans were obtained primarily for a personal, family, or household purpose.

### i. The 2016 Loan

Applying the five-factor test prescribed by *Thorns* to the 2016 loan, the Court finds the first, third, and fifth factors dispositive and concludes that the 2016 loan was obtained for personal reasons. Mr. Sundby's loan application does not evince a commercial purpose under the fifth *Thorns* factor. *Thorns*, 726 F.2d at 1419 (considering loan "statement of purpose"). Plaintiff checked a box in the application indicating that the purpose of the loan was to "refinance" (as opposed to "Purchase," "Construction," "Construction-Permanent," or "Other") given Plaintiff's "[e]xisting [l]oans [d]ue 4/1/16." ECF No. 196-1 at 96. Second, Plaintiff checked another box indicating that the Property was intended to be the borrowers' "Primary Residence" (as opposed to "Secondary Residence" or "Investment"). *Id.* Plaintiff and Edith Sundby, moreover, signed a statement on March 15, 2018 stating, "I understand and hereby certify that I WILL occupy the property that will secure the loan ('Security Property') as my primary residence . . . ." ECF No. 196-1 at 77. These facts show that Plaintiff obtained the loan to ensure he and his spouse could retain ownership of their home by paying off an existing mortgage. *Cf. Daniels v. SCME Mortg. Bankers, Inc.*, 680 F. Supp. 2d 1126, 1130 (C.D. Cal. 2010) (concluding that plaintiffs failed to allege they took a "personal" loan because they checked of the "investment" box and not a "primary" or "secondary" residence box).

Plaintiff's "occupation" is also unrelated to a commercial purpose. *See Hinchliffe v. Option One Mortg. Corp.*, No. CIV.A. 08-2094, 2009 WL 1708007, at *4 (E.D. Pa. June 16, 2009) (finding loan was commercial in part because the borrower managed investment properties "for a living" and testified he needed the loan to "operate his business"). Plaintiff indicated on the 2016 loan application that neither he nor his co-borrower were employed. ECF No. 196-1 at 96 (stating "NA" for their employers' names

and addresses). Instead, as noted in the 2017 loan application, their non-rental income is derived from social security, disability, and pension. *Id.* at 111.

Lastly, contrary to Defendants' arguments and pursuant to the third *Thorns* factor, the 2016 loan is not commercial merely because Plaintiff made some rental income from the "townhouse at 7740 Eads Avenue." ECF No. 196-1 at 131, 142–46. As indicated by Mrs. Sundby's declaration, the relevant lease agreements, and Plaintiff's calculations, Plaintiffs collected $37,056 rental income from April 6, 2016 to May 1, 2017. *Id.*; ECF No. 182-1 at ¶ 8. Per the second *Thorns* factor, Plaintiff's rental income accounts for less than half[4] of Plaintiff's monthly income. *Cf. Acevedo v. Loan Co. of San Diego*, No. 20-CV-1263-BAS, 2020 WL 4596760, at *4 (S.D. Cal. Aug. 10, 2020) (denying TRO to stop a foreclosure as unlikely to succeed under the *Thorns* test where, among other reasons, plaintiff's obtained rental income was more than double their monthly salary).[5]

It is of no consequence that Plaintiff communicated to MFG that he intended to sell the Property, listed the Property, and hired a sales agent. *See* ECF No. 164-3 at ¶ 7; ECF No. 196-1 at 79, 81, 92. This conduct does not render the loan's purpose commercial here as Mr. and Mrs. Sundby in fact lived in the Property. ECF No. 196-1 at 96; ECF No. 164-2 at 20.

Most significantly, as shown by MFG's escrow statement, the loan's proceeds were used to pay the existing principal on Plaintiff's prior home loan. ECF No. 196-1 at 102 (showing that approximately $2,191,000 of the $2,600,000 went to pay of the

---

[4] Plaintiff and his spouse earn $7,200 on a monthly basis. ECF No. 196-1 at 111. Of that, $3,200 is rental income. *Id.*

[5] Plaintiff states in his response statement of undisputed facts that the "7044 Eads Avenue is not part of the subject property." ECF No. 182-1 at ¶¶ 8, 17. While technically true, the Court assumes Defendants were referring to 7744 and not 7044 Eads Avenue. Consequently, the Court finds that Plaintiff's assertion does not create a genuine issue of fact for the jury to consider because Plaintiff stated at a deposition that the subject property included 7744 Eads Avenue. ECF No. 192-3 at 8. "[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032, 1046 (S.D. Cal. 2019), *aff'd*, 814 F. App'x 194 (9th Cir. 2020) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).

outstanding principal and the remainder was applied to fees, commissions, and pre-paid interest on the 2016 loan). Moreover, after paying commissions, costs, and fees associated with the 2016 loan, Plaintiff received only a small percentage of the loan – about $85,000 of the $2,600,000 loan in payment – and avers that "none . . . was used for either business or commercial purposes." ECF No. 182 at 4; ECF No. 196-1 at 102, 122; ECF No. 165-6 at 23, 34. *Cf. Bokros v. Assocs. Fin., Inc*., 607 F. Supp. 869, 872 (N.D. Ill. 1984) ("primarily" under TILA refers to the use of more than half the funds for a particular purpose).

Thus, while the second and fourth *Thorns* factors weigh against the Plaintiff, given the transaction's high value and that Mr. Sundby "personally manage[d] the acquisition" as evidenced by his communications with MFG, the facts demonstrate that the 2016 loan was obtained and used "primarily" for personal reasons and the commercial purpose exemption does not apply. *See Pena v. Cara Brooks Corp. Defined Benefit Pension Plan*, No. 09-CV-720-BTM, 2010 WL 11508840, at *4 (S.D. Cal. Feb. 11, 2010) (concluding that a loan fell within TILA despite two contrary *Thorns* factors, i.e., that "the ratio of Plaintiff's income to the amount of the acquisition and the size of the transaction are extremely large"). The Court finds that there is no genuine dispute of material fact that Plaintiff sought the loan primarily for a "personal, household, or family purpose." 15 U.S.C. § 1602(i).[6]

---

[6] Defendants separately argue the loan should not be considered personal in nature merely because it is secured by Plaintiff's primary residence. ECF No. 164-2 at 18. While that may be true, the cases relied upon by the Defendants are distinguishable on the facts as the majority of the proceeds from Plaintiff's loans were not used for a business. *See Tower v. Home Const. Co. of Mobile*, 458 F. Supp. 112, 117 (S.D. Ala. 1978) (loan obtained to fix up a house in poor condition to gain rental income for years while plaintiffs did not live in it); *Sherlock*, 2008 WL 732146, at *9 (loan obtained to "pay off various business-related debts and to obtain cash for ongoing business endeavors."); *Sherrill v. Verde Capital Corp.*, 719 F.2d 364, 366 (11th Cir. 1983) (loan obtained "to build a barn and to use as working capital"); *Bokros v. Assocs. Fin., Inc.*, 607 F. Supp. 869, 871–72 (N.D. Ill. 1984) (loan obtained and "more than half the proceeds . . . used for down payment on a tractor-trailer for [plaintiff's] business").

### ii.    The 2017 Loan

The Court reaches the same conclusion as to the 2017 loan, though the analysis differs in two important respects.

First, Defendants argue that Plaintiff "intended to divide the Property into two condominium units and sell the Property during the term of the" 2017 loan. ECF No. 164-2 at 19. But Defendants do not provide a factually analogous case to support the argument that obtaining a condo map transforms a home loan into a commercial loan. To the contrary, loans obtained to improve a borrower's residence are not categorically commercial, even where they augment the value of the home for a future sale. *See In re Dawson*, 411 B.R. 1, 35 (Bankr. D.D.C. 2008) ("In any event, a homeowner who borrows funds to improve a home that is her principal residence acts as a consumer, and not for commercial or business purposes, even if the funds are to be used to repair the home in order to facilitate a sale of the property."); *see also Thorns*, 726 F.2d at 1419 (finding that "a loan for the purpose of purchasing a limited partnership interest for investment may be covered by TILA.").

More importantly, it is undisputed that about 96% of the loan proceeds went towards satisfying the taxes and the principal of a prior loan on the 2016 home loan as well as other transaction-related costs, fees, and commissions. ECF No. 196-1 at 122. As to the other 4%, Defendants' expert asserts that Plaintiffs intended to use those funds – about $128,000 obtained by wire transfer from the lenders – towards the condominium map. ECF No. 180-1 at 14 ("The cash to the Plaintiff was for the fees associated with the planning and recording of a condominium map with the City."). However, neither Mr. Hibert's Report nor Defendants' papers point the Court to any documents or testimony to support that claim. *Id.*; *cf. Gombosi v. Carteret Mortg. Corp.*, 894 F. Supp. 176, 181 (E.D. Pa. 1995) (granting summary judgment to defendant where the evidence *showed* only a "small portion of the [loan's] proceeds" were used for a personal purpose). To the contrary, Plaintiff avers that the proceeds were *not* used for commercial or business

purposes. ECF No. 182-2 at ¶¶ 26, 27.[7] And, in the end, Plaintiff's interest in obtaining a condominium map from the City of San Diego did not come to fruition, further undermining Defendants' argument as to a primary commercial purpose. ECF No. 196-1 at 5 (noting at his deposition that plaintiff did not receive approval to split the Property into two condominiums).

Thus, the Court concludes that Plaintiff's intent to obtain a city permit to sub-divide the property into two units does not evince a primary commercial purpose to the loan because 96% of the loan's proceeds were used for a personal purpose: paying off a mortgage on plaintiff's home and primary residence. *See Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 704 (9th Cir. 1986) (affirming district court's conclusion that a loan was obtained for "personal" purposes even though some of the loan was used for business purposes because those funds "constituted only ten percent of the loan"). Moreover, to the extent Plaintiff's statement and Mr. Hibert's report are in conflict, the Court finds that this factual dispute is immaterial because it pertains only to 4% of the loan. In other words, even assuming 4% of the loan's proceeds were used for the condominium project, the loan's primary purpose remains personal.

As to the second *Thorns* factor, this evidence shows the extent to which Plaintiff has "managed" the condominium project. Plaintiff hired an architect to provide a timeline and budget for the permitting process of the condominium map and contacted a sales agency (Sotheby's) to list the home. ECF No. 196-1 at 82–88, 93. Nonetheless, this kind of conduct is but one factor in categorizing the purpose of the loan. *Cf. Heejoon Chung v. U.S. Bank, N.A.*, 250 F. Supp. 3d 658, 681 (D. Haw. 2017) (finding loan was obtained for personal purposes even after plaintiff hired a property manager to rent the property).

---

[7] Defendants object to this evidence on the basis that they are conclusory statements insufficient to create a genuine factual dispute. ECF No. 192-2. The Court denies the objection. The statement is sufficiently factual in nature for the Court to consider it here. *See Yazzie v. Ray Vicker's Special Cars, Inc.*, 12 F. Supp. 2d 1230, 1232 (D.N.M. 1998) (denying summary judgment on an identical statement).

As to the first, third, and fourth *Thorns* factors, the Court's analysis remains largely unchanged from the earlier 2016 loan. On the one hand, the 2017 loan is also a large transaction. ECF No. 164-5 at 54 (2017 note promising to pay $3,160,000). On the other hand, Mrs. Sundby made a similar amount of rental income during the term of the 2017 loan, which again is less than Mr. and Mrs. Sundby's non-rental income. ECF No. 182-1 at ¶ 12 (stating the rental income earned from July 7, 2017 to July 8, 2018 was $38,612); ECF No. 196-1 at 112 (showing rental income is less than other income); ECF No. 196-1 at 131, 147–55 (providing the relevant rental agreements). And, Plaintiff's occupation remains unrelated to the loan as he was unemployed. ECF No. 196-1 at 111.

As relevant to the fifth *Thorns* factor, the statement of purpose for the loan, Defendants highlight the 2017 Promissory Note. ECF No. 164-2 at 20. Paragraph 9 of the Note indicates a commercial purpose: "Loan Proceeds are intended to be used primarily for business and commercial purpose and are not intended to be used for personal, family, or household purpose or in any manner which may result in the loan Transaction not being exempt from Truth in Lending Act (TILA), 15 U.S.C.A. 1602 (h) . . ." ECF No. 164-5 at 55, ¶ 9. This Paragraph, however, is insufficient to defeat Plaintiff's motion for summary judgment for two reasons.[8]

First, the surrounding circumstances as to when and how Paragraph 9 was added to the 2017 loan lead one to question its probative value in determining the purpose of the loan. Plaintiff explains in his opposition that he only agreed to sign a new version of the Note that included Paragraph 9 after Defendant MFG's Vice-President, Mr. Solovy, informed Plaintiff that Paragraph 9 "would only apply to what is actually used to secure a condo map." *See* ECF No. 182-2 at 11, ¶ 18 (citing ECF No. 33-1 at ¶ 9). Plaintiff

---

[8] Plaintiff carries the burden of showing that TILA applies to the disputed transaction. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 751 (3d Cir. 1975). Thus, even though the Court here addresses an argument stemming from Defendants' motion, ECF No. 164-2 at 19, Plaintiff carries the burden to establish that TILA, in fact, applies here.

communicated to Defendant MFG that "approximately 96% of the $3,160,000 loan was to cover total closing costs" (i.e., not to secure a condo map) and thus believed that Paragraph 9 was not binding on the loan. ECF No. 33-1 at ¶ 9. Additionally, Plaintiff understood from Mr. Solovy that Paragraph 9 was "just merely something that underwriting required at the last minute." *Id.* And, Defendant MFG does not dispute that Mr. Solovy made these representations to Plaintiff right before signing the loan. ECF No. 192-1 at ¶ 8.

Instead, Defendant MFG contends that the language of the Note constitutes a "binding admission" of the loan's purpose. *Id.* The Court does not agree.[9] Ultimately, it is undisputed that about 96% of the proceeds went towards satisfying the taxes and the principal of a prior loan on the 2016 home loan as well as other transaction-related costs, fees, and commissions. As such, notwithstanding Paragraph 9, Plaintiff's unrebutted evidence as to the actual use of funds, the timing of the addition of Paragraph 9, and

---

[9] First, Defendants are incorrect that the terms of the Contract cannot be interpreted with reference to the foregoing facts. Longstanding California law provides that extrinsic evidence may be considered to determine the Parties' intended meaning of the terms in a contract. *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39–40 (1968) ("Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms . . . . Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties."); *accord Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006); *see also* Cal. Civ. Proc. Code § 1856(a), (g) ("Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement . . . [but t]his section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud."); *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1021 (N.D. Cal. 2018) (applying state law to contracts interpretation). Regardless, the Court refers to Plaintiff's evidence, and Defendant's failure to dispute the evidence, to assess the question properly before the Court now – i.e., whether Plaintiff obtained the loan "primarily for personal, family or household purposes" under TILA, *Thorns v. Sundance Properties*, 726 F.2d 1417, 1418 (9th Cir. 1984) (quoting 15 U.S.C. § 1602(h)) – and *not* merely to objectively interpret the contract's terms.

Defendant's representations regarding its effect all support Plaintiff's position that he obtained the loan for a personal reason: to refinance the mortgage on his home.

In addition, courts do not determine the purpose of a loan under TILA by looking exclusively to the terms of the loan documents. To the contrary, there is a strong, national consensus that courts must "look at the entire transaction and surrounding circumstances to determine a borrower's primary motive." *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010); *accord Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir. 1980) (courts "must examine the transaction as a whole and the purpose for which the credit was extended in order to determine whether this transaction was primarily consumer or commercial in nature"); *Gallegos v. Stokes*, 593 F.2d 372, 375 (10th Cir. 1979) ("Cases considering whether a transaction is primarily consumer or commercial in nature look to the transaction as a whole and the purpose for which credit was extended."). Looking beyond the text of the Note to determine whether the loan was "extended primarily for business, commercial, or agricultural purposes," 15 U.S.C. § 1603(1), best comports with the Ninth Circuit's direction that courts are to construe TILA's "provisions liberally in favor of the consumer." *In re Ferrell*, 539 F.3d 1186, 1189 (9th Cir. 2008) (quoting *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir.1989)); *accord Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009).

And, here, that context strongly supports a finding that Plaintiff obtained the 2017 loan for personal purposes. Plaintiff indicated on the 2017 loan application that the purpose of the loan was to "refinance" given Plaintiff's "[e]xisting [l]oans" and that the Property was intended to be the borrowers' "Primary Residence." ECF No. 196-1 at 111. The 2017 loan, moreover, gave Plaintiff a more favorable fixed interest by half a percent, thus supporting the inference that it was an advantageous mortgage decision aside from any business interest. *Id.* at 102, 111, 118. Plaintiff and his spouse also lived in the home and used the loan's proceeds to pay off the existing principal of the 2016 home refinancing loan. ECF No. 196-1 at 122. Thus, in sum, the Court concludes that the fifth

25

*Thorns* factor, Plaintiff's statement of purpose for the loan, does not support Defendants' motion.

Accordingly, taking account of the transaction a whole, and viewing the applicable facts through the prism of the five-factor test prescribed by *Thorns* to the 2016 and 2017 loans, the Court concludes that the 2016 and 2017 loans were obtained primarily for a personal, family, or household purpose.[10] *See Thorns*, 726 F.2d at 1419.

### 3.   The Sundby Trust's Loans are Not Bridge Loans.

The Court next considers whether the 2016 or 2017 loans are exempt from TILA as bridge loans. TILA provides that "[t]his subsection shall not apply with respect to any reverse mortgage or temporary or *bridge loan* with a term of 12 months or less, including to any loan to purchase a new dwelling where the consumer plans to sell a different dwelling within 12 months." 15 U.S.C. § 1639c(a)(8) (emphasis added).

As a threshold matter, the Court observes that, even if the subject loans were bridge loans, it is not clear § 1639c(a)(8) moves such loans beyond the protection of TILA entirely. After all, § 1639c(a)(8) expressly revokes the application of "[t]his subsection," and the word subsection refers only to § 1639c(a), i.e., the ability-to-pay provisions. *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1116 (S.D. Cal.) (explaining the difference between the terms section, subsection, paragraph, and sub-paragraph in legislative drafting); *see also* OFFICE OF THE LEGISLATIVE COUNSEL, U.S. HOUSE OF REPRESENTATIVES, QUICK GUIDE TO LEGISLATIVE DRAFTING (1/13/2019), (demonstrating that the term "Subsection" applies to provisions beginning with lower case letters within the same Section). Consequently, it is not clear that this statutory

---

[10] In reaching this decision the Court concludes the loan was "*primarily* for personal, family, or household purposes," 15 U.S.C. § 1602(i) (emphasis added), and that it was *not* "*primarily* for business, commercial, or agricultural purposes . . . ." 15 U.S.C. § 1603 (emphasis added); 12 C.F.R. § 1026.3 (stating that "[a]n extension of credit primarily for a business, commercial or agricultural purpose" is not subject to TILA) (emphasis added).

26

language supports Defendants' assertion that a bridge loan is not subject to *any* TILA liability. ECF No. 164-2 at 21–22.

Defendants' argument, moreover, separately fails because neither the 2016 nor the 2017 loans qualify as bridge loans given the language of 15 U.S.C. § 1639c(a)(8) and for the reasons articulated below.

### i. The 2016 Loan

When determining whether a consumer credit qualifies as a "bridge loan," the Court first looks to the promissory note to see if the loan has a "term of 12 months or less." *Id.*; *see Hindorff v. GSCRP, Inc.*, No. 13-CV-00955-PAB, 2013 WL 2903451, at *7 (D. Colo. June 14, 2013) (referring to the note's terms). The Court, moreover, begins calculating the term of the loan with the date that interest first accrues, consistent with TILA's treatment of when a loan is "consummate[ed]." *See* 12 C.F.R. § 1026.2 ("Consummation means the time that a consumer becomes contractually obligated on a credit transaction."). Here, the 2016 note states that the loan's "[i]nterest commences on 04/06/2016" and that the loan's "Due Date" is "05/1/2017." ECF No. 164-5 at 38. Consequently, the Court finds the Note has a term of about 13 months.

The Court's conclusion finds additional support in Defendant MFG's treatment of the loan. For example, on March 28, 2016, Barrie Corenman of RidgeGate escrow emailed Plaintiff and informed him that R.J. Solovy of Defendant MFG said "the loan is for 13 months." *See* ECF No. 182-2 at 7. In addition, on April 8, 2016, a Marquee escrow agent named Roni Santillan emailed Plaintiff and stated that the "[i]nterest has been prorated *through* May 1, 2016" and that the final loan payment would be due on May 1, 2017, thus treating the loan term as greater than one year. ECF No. 165-6 at 7 (emphasis added).

The Court's conclusion, moreover, comports with a reasonable understanding of the term "bridge loan." Bridge loans are "meant to provide short term interim financing until such time when more permanent financing can be obtained." *Summit Tr. Co. v.*

*Chichester*, 233 N.J. Super. 417, 419 (App. Div. 1989). In other words, bridge loans are obtained in anticipation of other financing. *See, e.g.*, *Sullivan v. Glenn*, 782 F.3d 378, 379 (7th Cir. 2015) (wherein defendants obtained a three-week loan until a separate line-of-credit would become available); *In re Sobel*, No. 08-34810 RTL, 2011 WL 309092, at *6 (Bankr. D.N.J. Jan. 28, 2011) (describing a loan "intended to provide temporary financing while Debtors sold off certain other properties" as a bridge loan); *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 974 (1998) (defining a bridge loan as "a short term loan between the construction loan and the buyer's permanent loan" use to facilitate the sale of an investment property). TILA specifically provides an example of such loans: loans obtained "to purchase a new dwelling." 15 U.S.C. § 1639c(a)(8); *Matter of Hughes*, No. AP 17-5169-LRC, 2018 WL 1801226, at *7 (Bankr. N.D. Ga. Apr. 13, 2018) (defining a bridge loan as a loan to "acquir[e] or construct[] a new principal dwelling"); *Summit Tr. Co.*, 233 N.J. Super. at 419 (wherein defendants obtained a three-month loan until a larger mortgage could be obtained for the purchase of a new home). California law similarly does not treat bridge loans as consumer loans, and defines bridge loans to include "any temporary loan, having a maturity of one year or less, for the purpose of acquisition or construction of a dwelling intended to become the consumer's principal dwelling." Cal. Fin. Code § 4970 (2020).

Here, the facts do not justify treating the 2016 loan as a "bridge loan." The facts do not establish that the 2016 loan was obtained so that Plaintiff could "purchase a new dwelling." 15 U.S.C. § 1639c(a)(8). Likewise, the facts do not show Plaintiff obtained the loan pending the funding of another loan as a "bridge." *Id.* At most, Defendants allege Plaintiff intended to sell the Property during the pendency of the loans, but that is not enough to transform the subject loan to a "bridge loan." Consequently, Plaintiff has established that the 2016 loan is not exempted from the requirements of TILA.

Defendants' arguments, moreover, are not to the contrary. Defendants assert that the loan was intended to have 12 monthly interest payments, in reliance on Plaintiff's

loan application, loan disclosure statement, and escrow instructions. ECF No. 165-4 at 95, 104, 108. Defendants explain that the loan was funded early, on April 6, 2016, for which Plaintiff was assessed additional interest beyond the scope of the alleged bridge loan. ECF No. 164-5 at 23 (escrow closing statement noting "[i]nterest paid from 04/06/2016 to 05/01/2016"); ECF No. 196-1 at 105. Defendants claim that this is a common industry practice and does not indicate the commencement of the loan. ECF No. 164-5 at 3–4, Decl. of John Solovy (asserting that "the 2016 Loan funded twenty-five (25) days early on April 6, 2016 before the one-year term of the 2016 Loan commenced on May 2, 2016, 2020.").

The Court, however, is unpersuaded by Defendants' assertions. Defendants offer no legal precedent to support their argument that pre-loan documents or industry norms should supersede the express terms of the loan. To the contrary, the loan's terms speak for themselves and are binding upon the Court. *See Jensen v. U.S. Bank N.A.*, 615 F. App'x 870, 872 (9th Cir. 2015) (observing that a home loan's terms are binding); *Lewis v. Am. Sav. & Loan Ass'n*, 905 F.2d 1540 (9th Cir. 1990) (describing a loan agreement's "terms of repayment" as "essential" to the contract). And, even assuming funding a loan early is an "industry practice," the fact remains that doing so extends the life of the loan. Consequently, the Court finds the 2016 loan is not a bridge loan under 15 U.S.C. § 1639c(a)(8).

### ii.   The 2017 Loan

The Court concludes that the 2017 loan is also not a bridge loan for the same reasons as the 2016 loan. As with the 2016 loan, the term stated in the 2017 promissory notes each exceeds one year in length. The 2017 MFG Note states that the loan's "[i]nterest commences on 07/07/2018" and that the loan's "Due Date" is "07/08/2017." ECF No. 164-5 at 54. The 2017 Original Note states that the loan's "[i]nterest commences on 07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 165-6 at 12. Lastly, the 2017 Fine Note states that the loan's "[i]nterest commences on

07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 30-1 at 37. In addition, Defendants admits that the 2017 loan was funded on July 5, 2017. ECF No. 164-3 at ¶ 13. Defendants again explain, with reference to the escrow closing statements, that the loan was funded early *before* the one-year term began. ECF Nos. 164-5 at 25 (escrow closings statement charging "[i]nterest from 07/05/2017 to 07/06/2017"); ECF No. 164-5 at 5 ("the 2017 Loan began to be funded three (3) days early on July 5, 2017 before the one-year term of the 2017 Loan commenced on July 8, 2017"). The Court, however, again finds no reason to depart from the express terms of the promissory notes in determining when the loan commenced and concluded.

Consequently, the Court finds that the 2017 loan was not a "bridge" loan as defined above and did not have "a term of 12 months or less," even if that term was only a few days longer. 15 U.S.C. § 1639c(a)(8). In reaching this conclusion, the Court is mindful of the Ninth Circuit's instruction that "[t]echnical or minor violations of TILA or Reg Z, as well as major violations, impose liability on the creditor . . . ." *Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 704 (9th Cir. 1986).

### B. Whether Plaintiff Prevails on his TILA Claims

Having established that TILA applies to Plaintiff's loans, Plaintiff need only show a straightforward violation of TILA to prevail at summary judgment. *See Semar*, 791 F.2d at 704; *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir.1976) ("[O]nce the court finds a violation, no matter how technical, it has no discretion with respect to liability."). "TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made." *In re Wolfe*, No. 99-12837PM, 2000 WL 36688916, at *1 (Bankr. D. Md. May 19, 2000) (citing 15 U.S.C. § 1640(a)). And, a "creditor who fails to comply with TILA in any respect [becomes] liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent." *Thomka v. A.Z. Chevrolet Inc.*, 619 F.2d 246, 249–50 (3d Cir. 1980).

The Court thus analyzes each violation in turn and concludes that the 2016 and 2017 Notes in this matter support entering summary judgment on each of Plaintiff's alleged violations except as to Defendant MFG under 15 U.S.C. § 1639c(a).

### 1. Prepayment Penalty Violations by Lender Defendants

First, the Court assesses Plaintiff's claim for prepayment penalties. A prepayment penalty is "a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due . . . ." 12 C.F.R. § 1026.32. TILA prohibits the inclusion of a clause requiring a prepayment penalty in the loan terms of high-cost mortgages. 15 U.S.C. § 1639(c)(1)(A). A "high-cost mortgage" is "a consumer credit transaction [e.g., a loan] that is secured by the consumer's principal dwelling . . . ." 15 U.S.C. § 1602(bb)(1)(A). To qualify as a "high-cost mortgage" the subject loan must also meet one of three additional criteria. 12 C.F.R. § 1026.32(a)(1). As relevant here, the loan must include a prepayment penalty that is "more than 2 percent of the amount prepaid" by the consumer. 12 C.F.R. § 1026.32(a)(1)(iii); *see also* 15 U.S.C. § 1602(bb)(1)(A)(iii).

Thus, to prevail on the prepayment penalty argument, Plaintiff must show that his loans are "high-cost mortgages" and that the loan terms required the payment of a "prepayment penalty" within the meaning of TILA. Plaintiff has met his burden.[11]

With respect to the 2016 loan, it is undisputed that Plaintiff secured the loan with his principal dwelling as the Property is his home and primary residence. And, the "Schedule of Real Estate Owned" in Plaintiff's 2016 loan application reveals Plaintiff owned no other real estate at the time. ECF No. 165-6 at 4. Plaintiff's 2016 loan, moreover, contains a clause requiring the payment of a prepayment penalty equal to at

---

[11] Plaintiff posits that the loan is a high-cost mortgage because "90 days of interest on the 10% loan was more than 2 percent (90/365 x 10% = 2.46%)." ECF No. 165-2 at 9. Though the Court agrees with Plaintiff's conclusion, it rejects this reasoning because TILA requires the Court to assess if the prepayment penalty is more than 2% of the "amount prepaid," not the annual interest on the loan. 15 U.S.C. § 1602(bb)(1)(A)(iii).

1  least "90 days interest from the day of this loan funding." ECF No. 164-5 at 38, ¶ 5. And,

2  a payment of 90 days of interest, which amounts to $64,109.59,[12] is "more than 2 percent

3  of the amount prepaid," which amounts to $238,333.37. ECF No. 165-6 at 23. Thus,

4  Plaintiff's 2016 loan is a high-cost mortgage with a prepayment penalty in violation of

5  TILA.

6          With respect to the 2017 loan, it is undisputed that Plaintiff secured the loan with

7  his principal dwelling as the Property is his home and primary residence. And, the

8  "Schedule of Real Estate Owned" in Plaintiff's 2017 loan application reveals Plaintiff

9  owned no other real estate at the time. ECF No. 196-1 at 113. Plaintiff's 2017 loan,

10  moreover, contains a clause requiring the payment of a prepayment penalty equal to "the

11  difference between Six (6) month(s) of interest" and the interest due as of the "date of the

12  prepayment" if "this loan is paid off or refinanced during the first Six (6) month(s) of the

13  term." ECF No. 164-5 at 58; ECF No. 165-6 at 14. And, that payment, which the 2017

14  Mortgage Loan Disclosure Statement indicate could be as high as $150,100,02,[13] ECF

15  No. 196-1 at 118, is larger than two percent of $275,183.37, the amount prepaid on the

16  loan. ECF No. 165-6 at 24. Thus, Plaintiff's 2017 loan is a high-cost mortgage with a

17  prepayment penalty in violation of TILA.

18          Accordingly, because (1) Plaintiff's home is his principal dwelling, (2) his loans

19  qualify as "high-cost mortgages," and (3) each of the promissory notes contain a

20

---

21  [12] To calculate this figure, the Court took the total loan amount ($2,600,000), multiplied by the interest
22  rate (10%), and then multiplied that number by 90/365, to account for the 90 days of interest. The Court
observes, moreover, that the 2016 Mortgage Disclosure Statement indicates the prepayment penalty
23  amount is $65,001. ECF No. 196-1 at 105. Under either figure, the prepayment penalty is well over two
percent of the "amount prepaid" towards the loan.
24  [13] The Court recognizes that loan provision here provides for a variable prepayment penalty and
nonetheless finds that the subject provision qualifies under TILA for three reasons. First, Defendants do
25  not oppose Plaintiff's argument. *See generally* ECF Nos. 179, 180, 181. Second, the record indicates
that all the Parties, as well as the California Department of Real Estate, considered this to be a
26  prepayment penalty. *See* ECF No. 196-1 at 118. Third, given that the loan payment could be as high as
$150,100.02, and the payment need only be more than two percent of the amount prepaid to qualify as a
27  prepayment penalty, (i.e., more than about $5,500), the payment qualifies. *Id.*

28

prepayment provision, the Court holds that Plaintiff's 2016 and 2017 loans violate 15 U.S.C. 1639(c)(1)(A). The Court separately relies on Defendants' failure to contest the merits of this violation in granting Plaintiff's motion for summary judgment. ECF Nos. 179, 181.

### 2.  Balloon Payment Violations by Lender Defendants

Second, the Court assesses the claim for balloon penalties. Section 1639(e) provides that "[n]o high-cost mortgage may contain a scheduled payment that is more than twice as large as the average of earlier scheduled payments." 15 U.S.C. § 1639(e). Here, the 2016 loan was expressly structured to have the entire principal and remaining interest due on a single day at the end of the loan and refers to that payment as a "balloon balance." ECF No. 164-5 at 37–41. The same is true of the 2017 loan, regardless of which Note applies. *See* ECF No. 165-6 at 10–14 (2017 Original Note); ECF No. 164-5 at 53–60 (2017 MFG Note); ECF No. 30-1 at 37 (2017 Fine Note). In addition, the loan servicer referred to these payments as balloon payments. ECF No. 165-6 at 8, 9 (email notices from Platinum Loan Servicing , Inc.). The Mortgage Disclosure Statements likewise refer to the payments as "balloon" payments. ECF No. 196-1 at 105, 118.

Accordingly, the Court holds that Lender Defendants violated 15 U.S.C. 1639(e) as to both loans. Defendants, moreover, do not contest this violation on the merits in responding to Plaintiff's motion for summary judgment. ECF Nos. 179, 181.

### 3.  Ability-to-Pay Violations by Lender Defendants

Third, the Court also finds that Defendants failed to adequately assess Plaintiff's ability-to-repay the mortgage given the limited information provided in the applications.

In outlining the responsibility of a creditor in providing a residential mortgage loan, § 1639c(a)(1) states that:

> In accordance with regulations prescribed by the [CFPB], no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability

to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments.

15 U.S.C. § 1639c(a)(1). The statute goes on to explain a creditor's "[b]asis for determination" to include:

A determination under this subsection of a consumer's ability to repay a residential mortgage loan shall include consideration of the consumer's credit history, current income, expected income the consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan.

15 U.S.C. § 1639c(a)(2). And, a creditor "shall determine the ability of the consumer to repay using a payment schedule that fully amortizes the loan over the term of the loan." *Id.*

Here, Plaintiff argues that Defendants violated § 1639c(a)(1) with respect to the 2016 loan because the application for the loan "did not include income or assets, other than the subject property itself." ECF No. 165-2 at 10. Likewise, Plaintiff contends that Defendants violated § 1639c(a)(1) as to the 2017 loan because the 2017 application listed only $7,200 monthly income, $5,840 expenses, $15,000 in non-property assets, and $40,000 in non-mortgage liabilities to service a $3,160,000 loan with $833.89 daily interest. *Id.* at 15. The Parties highlight no additional evidence substantiating Defendant's efforts to test or analyze Plaintiff's ability to pay the loan.

Given the lack information available to the Lenders, the lack of other evidence to indicate Defendants due diligence, and Defendants' failure to contest the ability-to-pay violation on the merits, ECF Nos. 179, 181, the Court finds that the instant facts support Plaintiff's claims against Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.  Violations by Defendant MFG

Lastly, the Court addresses Plaintiff's claims against Defendant MFG. First, as to the allegation that Defendant MFG steered Plaintiff to mortgages that he lacked the ability to pay in violation of 15 U.S.C. § 1639b(c)(3)(A)(i),[14] the Court agrees with Plaintiff that Defendant is liable for the same reason that the creditors are liable under § 1639c(a)(1): there are no facts indicating that Plaintiff's ability to pay was adequately considered and analyzed by Defendant MFG. To the contrary, it appears Defendants did not elicit the information necessary to evaluate Plaintiff's ability-to-pay.

As to Plaintiff's parallel allegation that Defendant MFG violated § 1639c(a) directly, the Court finds Plaintiff's arguments lacking. Plaintiff contends that the Court's prior holding that Plaintiff could bring forward a claim under § 1639c(a)(1) means, in short, "that 15 U.S.C. § 1639c(a) and its prescribed regulations" are applicable to mortgage originators. ECF No. 165-2 at 23; *see also* ECF No. 183 at 5. Plaintiff reaches this conclusion in reliance on 15 U.S.C. § 1639b(d)(1), which provides that:

> For purposes of providing a cause of action for any failure by a mortgage originator, other than a creditor, to comply with any requirement imposed under this section and any regulation prescribed under this section, section 1640 of this title shall be applied with respect to any such failure by substituting "mortgage originator" for "creditor" each place such term appears in each such subsection.

15 U.S.C. § 1639b(d)(1). Plaintiff adds, moreover, that applying § 1638c to mortgage originators is reasonable because (1) § 1639b shares a stated purpose with § 1639c – namely, "to assure that consumers are offered and receive residential mortgage loans on

---

[14] Plaintiff's authority to bring forward such a claim was explained in detail in the Court's August 21, 2019 Order. ECF No. 44. There, the Court concluded that § 1639b(c)(3)(A)(i) went into effect on January 21, 2013 after the CFPB declined to issue final regulations under that provision. *Id.* at 22. The Court relied on the express language of the Dodd-Frank Act, which stated that "[a] section of this title for which regulations have not been issued on the date that is 18 months after the designated transfer date [for rulemaking authority to over TILA to the CFPB] shall take effect on such date." *Id.* at 21 (quoting Pub. L. 111-203 § 1400(c), 124 Stat. 1376, 2136).

terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," 18 U.S.C. § 1639b(a)(2) – and (2) Congress stated in § 1639b(c)(3) that the CFPB should prescribe regulations prohibiting mortgage steering "in accordance with regulations prescribed under section 1639c(a) of this title." ECF No. 165-2 at 23; *see also* 15 U.S.C. § 1639b(a)(2), 1639b(c)(3)(A)(ii).

The Court finds Plaintiff's reading of the relevant statutes is flawed. First, 15 U.S.C. § 1639c expressly applies to "creditor[s]" and not to mortgage originators. Second, § 1639b(d)(1) directs the Court to replace the term "creditor" with "mortgage originator" only as to § 1640. Moreover, § 1639(d)(1) extends liability under § 1640 to violations of "any requirement imposed under *this section*." 15 U.S.C. § 1639b(d)(1) (emphasis added). The phrase "this section" refers only to § 1639b, and not to § 1639c, given Congress's methodology for drafting federal statutes. *See Koons*, 543 U.S. at 62 (describing differences between statutory sections and subsections); OFFICE OF THE LEGISLATIVE COUNSEL, U.S. HOUSE OF REPRESENTATIVES, QUICK GUIDE TO LEGISLATIVE DRAFTING (1/13/2019) (stating that a section "is the basic unit of organization of a statute" and is followed by "[s]ubsection[s]" which are styled in a parenthetical list). Finally, Plaintiff offers no legal authority to support his position.

Consequently, the Court finds that U.S.C. § 1639c(a) does not apply to mortgage originators. Plaintiff's only viable claim for relief against Defendant MFG thus arises under 15 U.S.C. § 1639b(c)(3)(A)(i).

### C. Limitations on Defendants' TILA Liability & Damages.

Defendant MFG further argues that, even if TILA applies and Plaintiff prevails, any damages as to it are limited under 15 U.S.C. § 1640(a)(2) to $4,000 per violation and cannot be awarded under 15 U.S.C. § 1640(a)(4). Defendant MFG also contends that Plaintiff cannot collect attorneys' fees because he proceeds *pro se*. The Court agrees with Defendant as to all three arguments.

36

### 1. Scope of 15 U.S.C. § 1640

TILA allows "for the recovery of actual damages in addition to statutory damages" as set out in 15 U.S.C. § 1640. *Koons*, 543 U.S. at 54. Section 1640(a), in turn, provides that "any creditor who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person in an amount equal to the *sum* of" the four subsections that follow (§§ 1640(a)(1)–(4)). 15 U.S.C. § 1640(a) (emphasis added).

First, a creditor who violates TILA may be liable for "any actual damage sustained by" the plaintiff. 15 U.S.C. § 1640(a)(1). Second, a creditor may also be liable to a consumer for "statutory damages" according to four rules:

    (i)     in the case of an individual action twice the amount of any finance charge in connection with the transaction,

    (ii)    in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $200 nor greater than $2,000,

    (iii)   in the case of an individual action relating to an open end consumer credit plan that is not secured by real property or a dwelling, twice the amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in the case of an established pattern or practice of such failures; or

    (iv)   in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4,000[.]

15 U.S.C. § 1640(a)(2)(A). Statutory and actual damages under TILA "perform different functions: statutory damages are reserved for cases in which the damages caused by a violation are small or difficult to ascertain. Actual damages may be recovered where they are probably caused by the violation. In this way, the damage measures are complementary rather than duplicative." *Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 436 (5th Cir. 2000).

Third, "in the case of any successful action to enforce the foregoing liability . . . [a creditor may be liable for] the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1640(a)(3). And, lastly, enhanced damages may be awarded in "an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material," where the creditor fails "to comply with any requirement under section 1639 of this title, paragraph (1) or (2) of section 1639b(c) of this title, or section 1639c(a) of this title . . . ." 15 U.S.C. § 1640(a)(4).

## 2.  Defendant MFG's Liability Under 15 U.S.C. § 1640

In light of the foregoing damages provision, Defendant MFG argues, in sum, that its damages are limited to $4,000 per statutory violation according to 15 U.S.C. § 1640(a)(2)(A) and that 15 U.S.C. § 1640(a)(4) does not apply because Plaintiff has only pled a violation of § 1639b(c)(3) against MFG. ECF No. 167-2 at 11–13. Plaintiff argues that *Koons* is inapposite and urges the Court to consider Plaintiff's statutory damages award under § 1639b(d)(2). ECF No. 183 at 4–6. Plaintiff further argues that § 1640(a)(4) does not exclude § 1639b(c)(3). *Id.* The Court concurs with Defendants.

First, Defendant is correct that statutory damages are capped at $4,000 for violations of TILA pursuant to the language of § 1640(a)(2). Among the four prongs of § 1640(a)(2), the Court finds that § 1640(a)(2)(A)(iv) applies specifically because Plaintiff's loans arise out of closed-end credits[15] secured by real property. Likewise,

---

[15] "TILA defines an open-end credit plan as a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." *Demarest v. Quick Loan Funding, Inc.*, No. CV-09–01687-MMM, 2009 WL 940377, at *3 (C.D. Cal. Apr.6, 2009) (quoting 15 U.S.C. § 1602(i)). In contrast, "[c]losed-end credit" is defined as "consumer credit other than 'open-end credit.'" 12 C.F.R. § 226.2(a)(10). Here, Plaintiff's loans fit the latter category, as is commonly the case with home loans. *See Demarest*, 2009 WL 940377, at *4 (collecting cases); *Johnston v. Lindaur*, No. 2:07-CV-01280-GEB, 2010 WL 147939, at *2 (E.D. Cal. Jan. 12, 2010) (finding that a mortgage loan is a "closed-end credit" transaction).

1   because Plaintiff brings forward an individual action, § 1640(a)(2)(A)(i) also applies.

2   Consequently, Plaintiff's statutory damages from Defendant MFG could include "twice

3   the amount of any finance charge" or "not less than $400 or greater than $4,000" for "an

4   individual action relating to a credit transaction . . . that is secured by real property or a

5   dwelling . . . ." 15 U.S.C. § 1640(a)(2)(A).

6        Moreover, per the Supreme Court's instruction in *Koons*, damages for a statutory

7   violation of TILA assessed as "twice the amount of the finance charge" under §

8   1640(a)(2)(A)(i) are nonetheless bound by § 1640(a)(2)(A)(iv)'s $4,000 ceiling per

9   statutory violation. *See Koons*, 543 U.S. at 62 (finding that §§ 1640(a)(2)(A)(ii) and

10   1640(a)(2)(A)(iv) create respective ceilings for statutory violations). As *Koons* explains,

11   statutory violations for close-ended credits like mortgages were initially awarded

12   damages under § 1640(a)(2)(A)(i) and, once the statute was amended to include the

13   language in § 1640(a)(2)(A)(iv), that language "remove[d] closed-end mortgages from

14   clause (i)'s governance only to the extent that" it prescribed a minimum of $400 and a

15   maximum of $4,000 per violation. *Koons*, 543 U.S. at 62; *see also Guadarrama v.*

16   *Chadorbaff*, No. SA-CV-17-0645-DOC, 2018 WL 5816191, at *7 (C.D. Cal. Apr. 30,

17   2018) (applying the same logic of *Koons* to 15 U.S.C. § 1640(a)(2)(A)(ii) and reducing

18   damages equaling twice the amount of the finance charge to $2,000).

19        Second, Defendant is correct that the plain language of 15 U.S.C. § 1640(a)(4)

20   renders it inapplicable to violations of § 1639b(c)(3). As Defendant observes, §

21   1640(a)(4) applies to three categories of violations: those under "any requirement under

22   section 1639 of this title," those under "paragraph (1) or (2) of section 1639b(c) of this

23   title," or those under "section 1639c(a) of this title." 15 U.S.C. § 1640(a)(4). None

24   include paragraph three of section 1639b(c). And, as noted, Plaintiff's argument that "§

25   1639c(a) and its prescribed regulations became the 'requirement' and 'regulations' of §

26   1639b(c)(3)(A)(i)" is unpersuasive. The Court, moreover, has found no authorities to

27   support Plaintiff's argument. Consequently, the Court finds that 15 U.S.C. § 1640(a)(4)

28

does not create enhanced liability for violations of § 1639b(c)(3)(A)(i) as to a mortgage originator.

Thus, in sum, and as to Defendant MFG's liability under § 1640, the Court concludes that (1) damages for statutory violations of TILA are capped to $4,000 for each violation under § 1640(a)(2)(A) and (2) Defendant MFG is exempt from liability under § 1640(a)(4) for any violation of § 1639b(c)(3).

### 3. Plaintiff Cannot Receive Attorneys' Fees.

Defendant MFG argues that Plaintiff cannot be awarded attorneys' fees because he proceeds without counsel. ECF No. 167-2 at 13. The Court agrees. *See Gonzalez v. Kangas*, 814 F.2d 1411, 1412 (9th Cir. 1987) (denying pro se appellant attorneys' fees); *Laughlin v. Comm'r*, 117 F. Supp. 2d 997, 1002 (S.D. Cal. 2000) ("The IRS correctly observes that, as a pro se plaintiff, Laughlin may not collect attorney's fees.").

### D. Plaintiff's Damages

Finally, the Court turns to Plaintiff's requests for statutory damages.[16] The Court finds that Plaintiff has not presented undisputed facts at this time for the Court to consider the issue of damages fairly and adequately. Plaintiff's statement of undisputed fact offers only two facts to support his argument that he is now entitled to damages from Defendants. *See* ECF No. 165-3 at ¶¶ 9, 19. This statement refers the reader to the "2016 Borrower's Final Settlement Statement," the "2016 Escrow Closing Statement," and the "2017 Escrow Closing Statement," but do not offer any calculations or specify what it is in those documents that entitles him to damages. *Id.*

While the Plaintiff has explained his damages request in more detail in his motion, ECF No. 165-2 at 22–23, this does not remedy the lack of specificity in his statement of undisputed fact. The purpose of the statement of undisputed fact is to identify "all

---

[16] At the September 10, 2020 hearing, Plaintiff stated that he is not seeking actual damages and is limiting his damages request to statutory damages.

material facts that the moving party contends are undisputed" so that the opposing party may adequately respond. *See* Hon. Gonzalo P. Curiel, Civil Pretrial & Trial Procedures ("Civil Chambers Rules") at 3, https://www.casd.uscourts.gov/judges/curiel/docs/Curiel%20Civil%20Chambers%20Rules.pdf.

Here, because Plaintiff has not identified the facts supporting his request for damages with sufficient specificity in his statement of undisputed facts, Defendants have not had an opportunity to respond directly to those facts or put forward any contradictory evidence that may be in their possession. Plaintiff has also failed to show those facts are undisputed. Thus, for both reasons, the Court finds Plaintiff has failed to meet his burden of persuasion. *See Wigent v. Sci. Applications Int'l Corp.*, 19 F. Supp. 3d 1012, 1025 (D. Haw. 2014) ("The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact."); *see also* Civil Chambers Rules at 3 (warning that the "failure to comply with this requirement of a separate statement may in the court's discretion constitute a sufficient ground for denying the motion"). Consequently, the Court **DENIES** Plaintiff's motion for summary adjudication as to the element of damages.

## V. Defendants' Motions for Summary Judgment on the Declaratory Judgment Cause of Action

The Court next turns to Plaintiff's second cause of action seeking a declaratory judgment that the alterations made to the 2017 deeds and notes are material, and thus the deeds are void. California law provides that a declaratory judgment sought under the common law is an equitable remedy.[17] *See Batt v. City & Cty. of San Francisco*, 155 Cal.

---

[17] Plaintiff argues that "there is no claim for equitable relief before the Court" and that Defendants have failed to pursue any such relief in the form of a counterclaim. ECF No. 165-2 at 27. "A particular declaratory judgment draws its equitable or legal substance from the nature of the underlying controversy." *Transamerica Occidental Life Ins. Co. v. DiGregorio*, 811 F.2d 1249, 1251 (9th Cir. 1987) (quotation omitted). Here, Plaintiff's second cause of action seeking a declaratory judgment is a

App. 4th 65, 82 (2007), *disapproved of for other reasons by McWilliams v. City of Long Beach*, 56 Cal. 4th 613 (2013); *accord Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1219 (S.D. Cal. 2012) (treating a request for "a declaration that the loan is voidable and rescinded" as equitable); *see also* 5 Witkin, Cal. Proc. 5th § 850 (2020) ("Declaratory relief is not a special proceeding. It is an action, classified as equitable by reason of the type of relief offered.").

Consequently, and for the reasons below, the Court **GRANTS** the request to void the altered documents and **DECLARES** that the 2017 Original Deed and Note presented by Plaintiff Sundby are valid.

### A. There are Several Material Alterations to the 2017 Loan Documents.

A deed is void if (1) it "is altered or changed by someone other than the grantor before it is delivered or recorded" and (2) "the alteration is without the grantor's knowledge or consent." *Lin v. Coronado*, 232 Cal. App. 4th 696, 702 (2014). The alteration, moreover, must be "material; that is, alterations which change the legal effect of the instrument." *Id.* at 703 (quotation omitted).

Immaterial alterations include, for example, removing the name of an alleged co-purchaser who had no interest in the property, *Lin*, 232 Cal. App. 4th at 704, and redacting the grantee's marital last name with white-out where her maiden last name remained. *In re Marriage of Brown*, No. E-040374, 2007 WL 2258726, at *2 (Cal. Ct. App. Aug. 8, 2007). Material changes, on the other hand, may include adding a co-grantee after a grantor signs the deed, *see Thomas v. Yin Hui Zhou*, No. B-270665, 2018

---

claim for equitable relief. Plaintiff is not seeking a declaratory judgment pursuant to a specific statute that provides such authority, *cf. Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943) (observing that, even in a case where the Court derived its authority to render declaratory judgments from a statute, the matter is "essentially an equitable cause of action"), nor is Plaintiff's second cause of action tied to his TILA claim. Rather, as the Court recognized in electing not to dismiss Plaintiff's action once before, "Plaintiff's second cause of action rests on California law, not TILA." ECF No. 44 at 26–27. Consequently, the Court finds that the second cause of action is equitable in nature, notwithstanding Plaintiff's contentions.

WL 1193433, at *5 (Cal. Ct. App. Mar. 8, 2018), *reh'g denied* (Mar. 29, 2018), *review denied* (May 16, 2018), changing the description of the property, *see Montgomery v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 85 Cal. App. 2d 559, 564 (1948), and adding a clause reserving certain rights from a property. *Garton v. Title Ins. & Tr. Co.*, 106 Cal. App. 3d 365, 377 (1980).

The Parties dispute whether various changes to the 2017 Deeds and Notes are material. Plaintiff argues that each change is material, whereas Defendants contend that no change is material. For the following reasons, the Court concludes that there are two material changes in the 2017 Altered Deed – a change to the description of the Property and the addition of a new lender – and one corresponding, material change to the 2017 Marquee and Fine Notes.[18]

### 1. The Addition of "as to Parcels, 1A, 1B and 2B" to the Deed.

First, the Court addresses the change to the summary description of the Property's parcels. California law "accords determinative legal effect to a description of land contained in a deed." *Mehdizadeh v. Mincer*, 46 Cal. App. 4th 1296, 1302 (1996), *as modified on denial of reh'g* (July 24, 1996). "To be sufficient the description must be such that the land can be identified or located on the ground by use of the same." *MTC Fin. Inc. v. California Dep't of Tax & Fee Admin.*, 41 Cal. App. 5th 742, 747 (2019) (quoting *Edwards v. Santa Paula*, 38 Cal. App. 2d 375, 380 (1956)). "[A] description that is equally applicable to two different parcels is fatally defective." *Id.* "If the writing itself does not furnish the means whereby the description may be made sufficiently definite and certain readily to locate the property, then the instrument must be held void." *U.S. Bank Nat'l Ass'n v. Lane*, No. A132059, 2013 WL 682803, at *12 (Cal. Ct. App. Feb. 26, 2013) (quotation and brackets omitted).

---

[18] Plaintiff also argues that the absence of Plaintiff's initials at the bottom of each page of the altered Deed is material. ECF No. 182 at 18. It is not because those markings have no legal effect.

Here, Defendant contends that the addition of the phrase "as to Parcels, 1A, 1B and 2B" following the borrower's name is immaterial because it does not "change the scope" of the Property's legal description. ECF No. 164-2 at 16. Rather, the 2017 Altered Deed clearly refers to the Property "because the legal description of the property encumbered is listed on page 1 of the 2017 DOT in the section entitled 'GRANT IN TRUST' and attached as 'EXHIBIT A' to the recorded document." *Id.* Plaintiff responds that the addition of this phrase narrows the scope of the property conveyed through the 2017 Altered Deed by expressly limiting the portion of the exhibit controlled by the deed, such that the 2017 Altered Deed would only legally convey title to Parcels 1A, 1B and 2B of Exhibit A. *See* ECF No. 182 at 15–16 (arguing that this "is a 'material' change" and framing Defendants' argument as an "attempt to argue that 'as to less than all parcels of Exhibit A' is the same as 'as to all parcels of Exhibit A.'") (emphasis removed).

Upon reviewing the 2017 Altered Deed, the Court concludes that the altered language renders the legal description of the Deed ambiguous and thereby changes its "legal effect." *Lin*, 232 Cal. App. 4th at 703. The Deed begins by stating that it is made between the Borrowers, Trustee, and Beneficiary "as to Parcels, 1A, 1B and 2B." ECF No. 164-5 at 43. This express language limits the scope of the Property to only three parcels. The Deed then continues by stating that the "trust herein created, irrevocably grants . . . to Trustee . . . the following described property," and then citing to an attached legal description. *Id.* Because this language is plainly inconsistent with the altered phrase, it introduces ambiguity into the scope of the land covered by the Deed. That ambiguity, moreover, is not resolved by the attached legal description, which only details each Parcel and does not state that they are being conveyed *together*. *Id.* at 51–52.

Consequently, because an alteration to the legal description of the Property to be conveyed in a Deed is certainly material, the Court finds that this defect renders the 2017 Altered Deed void. *See Montgomery*, 85 Cal. App. 2d at 563–65 (concluding that a deed was "absolutely void and conveyed no title" once it was altered "so as to cover the entire

lot instead of the east half which plaintiffs intended to convey" without the "knowledge, consent or approval of plaintiffs").

### 2. The Addition of a Lender to the 2017 Notes and Deed.

The Court next addresses the alterations to the lenders. Defendants contend that the only change as to the Lenders in the 2017 Deed of Trust and Loan is Lender Cobin's decision to "split the funding of his previously agreed upon $500,000 investment in the 2017 Loan between two (2), rather than one (1), of his personal financial accounts." ECF No. 164-2 at 16. Plaintiff responds that this resulted in a material change because, in the course of Mr. Cobin's change, Susan L. Cobin was added to the deed and the note as a Lender. ECF No. 182 at 16. Plaintiff also argues that, "[t]he same 'different ownership and interest percentages' alterations made to the 2017 [Original] Deed were made to the 2017 [Original] Note, also rendering it void ab initio." ECF No. 165-2 at 26.

Here, the Court again concurs with Plaintiff that the addition of a new lender is "material" within the meaning of *Lin* and finds *Thomas* instructive. *See Thomas*, 2018 WL 1193433, at *5. In *Thomas*, the California Court of Appeal, Second District, concluded that a "quitclaim deed [was] void because [plaintiff's] mother altered it to add [plaintiff] as a co-grantee after [her] father (a co-grantor) signed the deed, and [the mother] did so without [the] father's knowledge or consent." *Id.* at *5. Though *Thomas* concerned the addition of a co-grantee, the Court sees no reason to refrain from applying the same logic to the addition of a lender, as is the case here.

Defendants' replies, moreover, are unpersuasive. First, Plaintiff has not failed to "meet his burden of proof" as to this argument, ECF No. 192 at 10, because the Court need look no further than the language of the deeds. *Compare* 2017 Altered Deed, ECF No. 164-5 at 43 (listing "Steven M. Cobin *and Susan L. Cobin*, Trustees of the Cobin Family Trust Dated March, 9th 1984, as to an undivided 7.911% interest and Equity Trust Custodian FBO Steven M. Cobin Traditional IRA, as to an undivided 7.911% interest") (emphasis added) *with* 2017 Original Deed, ECF No. 165-6 at 15 (listing only

"Equity Trust Custodian FBO Steven M. Cobin Traditional IRA, as to an undivided 15.823% interest"). The same changes are evident in the language of the 2017 Notes. *Compare* 2017 Original Note, ECF No. 165-6 at 10–14 (listing only "Equity Trust Custodian FBO Steven M. Cobin Traditional IRA, as to an undivided 15.823% interest") *with* 2017 MFG Note, ECF No. 164-5 at 53–60 (listing "Steven M. Cobin *and Susan L. Cobin*, Trustees of the Cobin Family Trust Dated March, 9th 1984, as to an undivided 7.911% interest and Equity Trust Custodian FBO Steven M. Cobin Traditional IRA, as to an undivided 7.911% interest") (emphasis added) *and* 2017 Fine Note, ECF No. 30-1 at 37 (listing "Steven M. Cobin *and Susan L. Cobin*, Trustees of the Cobin Family Trust Dated March, 9th 1984, as to an undivided 7.911% interest and Equity Trust Custodian FBO Steven M. Cobin Traditional IRA, as to an undivided 7.911% interest") (emphasis added).

Also, it is irrelevant that Mr. Cobin's percentage ownership remains unchanged. Rather, the material alteration is the addition of a Susan Cobin as a co-lender, even if only by providing funds from a joint account with Steven Cobin. The addition of a new co-lender creates a legal interest as to that lender which, prior to their addition to the 2017 Notes and Deed, would not exist. This alters the legal effect of the loan documents. *Cf. Lin*, 232 Cal. App. 4th at 704 (finding change immaterial because the removed purchaser never had *no* legal interest in the property).[19] In addition, it is undisputed that Plaintiff did not know Susan Cobin would be added as a lender and Defendants'

---

[19] Plaintiff also contends that Mr. Cobin's decision to split his investment is material because it changed the source of Mr. Sundby's funds from Mr. Cobin's Trust to his Individual Retirement Account, which retains greater statutory protections from lawsuits and is taxed differently. ECF No. 182 at 16. The Court finds these allegations too specious to provide a basis for summary judgment. Plaintiff does not explain the potential legal ramifications with sufficient specificity for the Court to conclude that Mr. Cobin's decision to lend money out of a different account alters the "legal effect" of the Deed. *Lin*, 232 Cal. App. 4th at 703.

assertions that Plaintiff knew (1) Steven Cobin was a lender, and (2) that he would contribute $500,000, do not change this fact. *See* ECF No. 179 at 23–24.

### B. Relationship of Altered Deeds and Notes

The Court next considers Plaintiff's argument that the 2017 Altered Deed, 2017 MFG Note, and 2017 Fine Note are also void "because both the Plaintiff's 2017 deed and Solovy's altered 2017 deed incorporate the 'herein' 2017 note and its terms by reference, along with the irreconcilable version differences of the 2017 note." ECF No. 182 at 18–19. Defendants do not respond to this argument. The Court finds this argument persuasive in that it highlights the ambiguity created by the multiple deeds and notes resulting from Defendant MFG's alterations.

Under California law, a deed which potentially corresponds to multiple, materially different notes is not void if the reader can determine the note to which it corresponds. *See Rogers v. Evans*, 137 Cal. App. 538, 544–45 (Cal. Ct. App. 1934) ("Applying these rules of law, it is apparent that the payment of the debt, as evidenced by the promissory note, is the obligation that is secured. Hence, if the note can be identified by the other description thereof in the trust deed and parol evidence, after rejecting all erroneous portions, the variance between the note described in the trust deed and the note actually evidencing the indebtedness is not fatal.")

Here, it is not feasible to determine which Notes are referenced by the 2017 Altered Deed. First, it is undisputed that there are three Notes. These Notes, moreover, differ both as to their lenders, as explained above, and as to the dates on which the interest commenced and the final payment was due.[20] On the other hand, the Notes are

---

[20] The 2017 MFG Note states that the loan's "[i]nterest commences on 07/07/2018" and that the loan's "Due Date" is "07/08/2017." ECF No. 164-5 at 54. The 2017 Original Note states that the loan's "[i]nterest commences on 07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 165-6 at 12. Lastly, the 2017 Fine Note states that the loan's "[i]nterest commences on 07/05/2017" and that the loan's "Due Date" is "07/06/2018." ECF No. 30-1 at 37. The loan was funded on July 5, 2017. ECF No. 164-3 at ¶ 13.

the same in two respects relevant to this analysis: they are for the same amount and they are all dated 6/27/2017. ECF No. 164-5 at 54; ECF No. 165-6 at 12; ECF No. 30-1 at 37. That matters because the Deeds only refer to the notes by that information: "the repayment of indebtedness evidenced by Borrower's note (herein, 'Note') dated 06/27/2017, in the principal sum of U.S. $3,160,000.00, with payment of interest . . . ." ECF No. 164-5 at 43; ECF No. 165-6 at 15. The Deeds offer no "other description thereof." *Rogers*, 137 Cal. App. at 544–45.

At most, the Court can discern that the Original 2017 Deed refers to the Original 2017 Note because they share the same lenders, whereas the other documents differ by including Susan Cobin as a lender. On the other hand, it remains unclear whether the 2017 Altered Deed refers to the 2017 Fine Note or the 2017 MFG Note. Consequently, because the Notes are materially[21] different, and it is not possible to discern which Note is the subject of the 2017 Altered Deed, the 2017 Altered Deed is also void under *Rogers*.

### C. The Material Alterations were Created by a Non-Party to the Loan and thus Do Not Void the Original Loan Documents.

The Court's analysis, however, does not end here. Plaintiff is requesting equitable relief in the form of a declaratory judgment. This request requires the Court to rule in a manner that produces a just and equitable result that considers all of the salient circumstances. To the extent that Plaintiff seeks to void *all* the 2017 Deeds and Notes, he cannot. California law dictates that a material alteration to a contract (including one relating to real property) does not render the contract void where the material alteration is made by a "stranger" to the contract. *See Bumb v. Bennett*, 51 Cal. 2d 294, 303 (1958) (quoting *Walsh v. Hunt*, 120 Cal. 46, 53 (1898)) (observing that "an alteration by a stranger to the instrument or an agent acting beyond the scope of his authority is a mere

---

[21] The Court further observes that the Defendants admit that one example of a "material" alteration is a difference in "the length of the loan." ECF No. 164-2 at 6. Here, the Notes have different lengths.

spoliation and does not affect the right of the parties to enforce the instrument as it was originally written."); *accord Lee v. Lee*, 175 Cal. App. 4th 1553, 1557 (2009). Here, because the alterations were caused by Defendant MFG, and not Plaintiff or the Lender Defendants, the Court declares that the Original 2017 Deed and Note are valid in reliance on *Bumb* and *Lee* – two cases approvingly cited by *Lin*. *See Lin*, 232 Cal. App. 4th at 703.

In *Bumb*, the Supreme Court of California concluded that a material alteration of an assignment contract regarding real property did not render the contract void because the person responsible for the material alteration was an assignee. *Bumb*, 51 Cal. 2d at 298. There, two partners assigned rights over a property to the plaintiff for the benefit of their creditors. *Id.* One of the creditors, however, attached a lien to the property later that same day, which upon judgment was sold to the defendant. *Id.* When defendant filed suit to quiet title to the plaintiff assignee, the lower court deemed the assignment valid and thus entered judgment against the defendant. *Id.* Among other arguments, the defendant asserted on appeal that the assignment contract was void because, after the contract was signed, the assignee drew three lines through the word "net" in a clause providing that he would be entitled to "ten per cent (10%) of all net funds coming into his possession pursuant to [the assignment] agreement." *Id.* at 302. While recognizing this was a material alteration, the *Bumb* Court reasoned that, like a trustee to a sale of land, the assignee only held "bare legal title" to the property and was not a party to the underlying transaction or debt between the owners (here, the partners) and the lenders (here, their creditors). *Id.* 302–04. Thus, the assignee's material alteration "d[id] not invalidate the deed" altogether. *Id.* at 303. The Court held that the "alteration of the instrument in a manner neither sanctioned by, nor advantageous to, the parties beneficially interested, but solely for the purpose of increasing his own compensation, should not deprive the partnership creditors of their rights under the assignment." *Id.* at 29.

In *Lee*, the California Court of Appeal decided another appeal arising from an action to quiet title, wherein it ultimately concluded a material alteration did not void the contract as to the parties who agreed to the contract prior to the alteration. *Lee v. Lee*, 175 Cal. App. 4th 1553, 1558–59 (2009). In *Lee*, appellant, whose name remained on a lot's deed after his interest was purchased by his brother and mother in 1998, executed a quitclaim deed conveying their interest to his niece in 2002. *Id.* at 1555–56. After appellant executed the deed, and after his niece agreed to it, an unknown third party added two additional grantees to the deed before recording it. *Id.* at 1556. When the niece conveyed the property back to appellant in 2005, one of those two people and the niece sued to quiet title. *Id.*

In analyzing the effect of the alteration to the 2002 quitclaim deed, the *Lee* Court concluded that the deed was void as to the two additional grantees, but valid as to the niece. *Id.* at 1558. Relying on *Bumb*, the court reasoned that only "a material alteration by a party to the deed [] renders it void," and that the material alteration was made not by a party to the quitclaim deed – i.e., appellant's mother, brother, or niece – but by the unknown third party, who would presumably have even *less* legal right to the lot than a trustee. *Id.* at 1557 (citing *Bumb*, 51 Cal. 2d at 303). The *Lee* Court further observed that, "in the context of an executed contract, it has been held that a third party's alteration of that contract does not void the contract in its entirety. Rather, the contract is enforceable in accordance with its original terms." *Id.* at 1558 (citing *Walsh v. Hunt*, 120 Cal. 46 (1898); *Am. Tr. Co. v. Greuner*, 13 Cal. App. 2d 279 (1936)).

In light of these precedents, the Court voids the 2017 Altered Deed, 2017 MFG Note, and 2017 Fine Note, and declares the 2017 Original Deed and Note valid because MFG – not the lenders – is responsible for the alterations to each document. In responding to Plaintiff's interrogatories, MFG explains that two of its employees, escrow officers Roni Santillan and Megan Lagerson, made "a change related to investor vesting" on the 2017 note. ECF No. 165-7 at 12. Specifically, "Steven Cobin split his original

ownership interest in the note from 15.823% in his IRA to 7.911% in his trust and 7.911% in his IRA (Equity Trust Company)." *Id.* MFG continues, the "[s]ame lender merely allocated IRA money to the loan in lieu of taking it whole personally." *Id.* MFG also states that "Santillan changed the funding date on the promissory note to reflect the date funds were actually received," and that Mr. Solovy "was only made aware of the change via email." *Id.* With respect to the deed, Defendant MFG explains that Santillan and Lagerson changed "borrower vesting to include 'as to Parcels 1A, 1B, and 2B' per title company instruction as stated on the preliminary title report" and informed Mr. Solovy afterward. *Id.* at 13. Consequently, it is undisputed that the material alterations to the 2017 Deed and Notes were made by Defendant MFG. MFG's alterations are akin to those made by the unknown third party in *Lee* as MFG has no legal title or rights over the subject property. And, MFG would have even less legal right to the disputed property than the assignee in *Bumb*.

The Court recognizes, of course, that Defendant MFG's addition of a new lender may have resulted from trying to accommodate Mr. Cobin's investment needs. ECF No. 165-7 at 12. The record offered by Plaintiff is insufficient to establish that this possibility is undisputed. Moreover, even if this alone were to render Defendant MFG an agent of Mr. Cobin, the Court declines to impute MFG's actions to *all* of the Lender Defendants. That would be inequitable and would operate "to deprive the [lenders] of their rights under the" contract because of MFG's efforts to accommodate a single lender. *Bumb*, 51 Cal. 2d at 208. Moreover, while MFG may have acted to accommodate Mr. Cobin's desire to structure his loan differently, that did not prompt MFG to add language regarding the parcels covered by the Deed. As MFG explains, that alteration instead resulted from its employees' efforts to conform to the 2017 Altered Deed to the Property's title report, a document prepared by a third-party title insurance company. *See* ECF No. 165-7 at 13, 17–31. Lastly, based on the Parties' undisputed facts, MFG is the "only" party who created the alterations in the 2017 loan documents. ECF No. 179-1 at

¶¶ 25, 32. Consequently, the Court's decisions (1) to void the 2017 Altered Deed, MFG Note, and Fine Note, and (2) to declare valid the 2017 Original Note and Deed, are consistent with the undisputed facts, as well as the principles observed in *Lee* and *Bumb*.

As in both *Lee* and *Bumb*, the Court is also confident that the Original 2017 Deed and Note were properly executed and can be declared valid now. First, the documents have been produced in the record. ECF No. 165-6 at 10–22. Second, the facts show that Plaintiff Sundby sent the signed deed and note to Defendant MFG via FedEx on June 29, 2017, thereby indicating his assent as to both documents. ECF No. 165-5 at 11. *Cf. Lee*, 175 Cal. App. 4th at 1558 ("Applying these authorities here, it must be concluded that the deed is valid as to Fue Sue. The deed was executed and delivered to Fue Sue and thus vested title in Fue Sue before a third party altered the deed.").

In addition, there is no reason to think these documents have since been properly rescinded. Though Plaintiff asserted at the hearing on September 10, 2020 that the Original 2017 Note and Deed were rescinded, that assertion is without legal effect because Plaintiff has not "restor[ed] to the defendant[s] any value the plaintiff received from the transaction." *Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1225 (S.D. Cal. 2012) (quoting *Fleming v. Kagan*, 189 Cal. App. 2d 791, 796 (Cal. Ct. App. 1961)). "A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust." *Id.* (quoting *Karlsen v. Am. Sav. & Loan Ass'n*, 15 Cal. App. 3d 112, 117 (Cal. Ct. App. 1971)). This rule applies, moreover, even where the borrower "was induced to enter into the contract by the fraudulent representations of the defendant." *Kimball*, 881 F. Supp. 2d at 1225. Plaintiff, of course, has not repaid the outstanding loan to the Lenders. While the Court rejected a similar argument under TILA in considering Defendants' motion to dismiss earlier in this case, the Court finds the argument more persuasive now that it is adjudicating this issue on the merits and applying its equitable powers. *Cf.* ECF No. 44 at 26–30. Given the totality of the circumstances at issue in this matter, the Court is not prepared to recognize the

recission of the 2017 Original Note and Deed because that would leave the Lenders with an unsecured loan.

In sum, the Court finds that Defendant MFG made several, material alterations to the 2017 loan documents that support voiding certain transaction under *Lin*, including the addition of (1) language creating ambiguity as to the parcels covered by the deed, as well as (2) an additional lender providing funding for the loan. The 2017 Altered Deed is also separately void under *Rogers* because it is not possible to determine which of the two materially different notes – the 2017 MFG Note and the 2017 Fine note – are secured by, and correspond to, the deed. Nonetheless, the Court will void only the altered documents, and thus declare valid the 2017 Original Deed and Note under *Bumb* and *Lee*, because the above alterations were caused by a third-party to the contract, loan originator MFG. This, moreover, is the most equitable resolution as it compels the Parties to abide by the promises made to one another prior to MFG's alterations. The Court directs the Parties to correct the title report and record the original loan documents.

## VI. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the pending motions for summary judgment.

As to TILA, the Court rejects Defendants' arguments that TILA does not apply to the 2016 and 2017 loans. The Court also concludes that Plaintiff has met his burden in demonstrating (1) three TILA violations as to the 2016 Lender Defendants, (2) three TILA violations as to the 2017 Lender Defendants, and (3) one TILA violation as to the Defendant MFG. Thus, the Court summarily adjudicates liability under TILA as to Plaintiff's first cause of action.

As to damages on the first cause of action, the Court finds that Defendant MFG's statutory damages under § 1640(a)(2)(A)(i), (iv) are capped to $4,000 per violation and that § 1640(a)(4) does not apply. Plaintiff may not obtain attorneys' fees. And because Plaintiff has not established undisputed facts regarding damages, the Court will DENY

summary adjudication of the damages issue.  Thus, damages for the first cause of action remain to be decided.

Lastly, the Court concludes that the 2017 Altered Deed, 2017 MFG Note, and 2017 Fine Note are void, and declares that the 2017 Original Deed and Note are valid. The Court reaches this conclusion because the loan originator and not the Parties made material alterations to the loan documents without Plaintiff's consent prior to recording it, and because, even if one of Defendant MFG's alterations can be attributed to one of the Lenders, the Court will not impute that MFG's agency to *all* the lenders. The Court finds that this is the most equitable decision. Thus, the Court summarily adjudicates Plaintiff's second cause of action.

The Court modifies, in part, the November 19, 2019 scheduling order (ECF No. 70) as follows:

a. The parties shall comply with the pre-trial disclosure requirements of Fed. R. Civ. P. 26(a)(3) by **October 30, 2020**.

b. Plaintiff and defense counsel shall meet and take the action required by Local Rule 16.1(f)(4) by **November 13, 2020**.

c. Plaintiff will be responsible for preparing the pretrial order and arranging the meetings of counsel pursuant to Local Rule 16.1(f) by **November 20, 2020**.

d. The Proposed Final Pretrial Conference Order, including objections to any other parties' Fed. R. Civ. P. 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the Court by **December 4, 2020**, and shall be in the form prescribed in and comply with Local Rule 16.1(f)(6).

e. The final Pretrial Conference is scheduled on **December 17, 2020** at **1:30pm**. The Court will set a trial date during the pretrial conference. The Court will also schedule a motion in limine hearing date during the pretrial conference.

**IT IS SO ORDERED.**

Dated:  September 14, 2020

Hon. Gonzalo P. Curiel
United States District Judge

3:19-CV-0390-GPC-AHG